(11 Misc. Rep. 468.)

## NASH et al. v. HALL et al.

(Supreme Court, Special Term, New York County.   February, 1895.)

1. INJUNCTION—TRANSFER OF CORPORATE STOCK—WRONGFUL ISSUE.

The officers of a corporation will not be enjoined, at the suit of a stockholder, from disposing of or transferring stock, where the complaint merely alleges that defendants caused such stock to be issued to themselves for an inadequate consideration, but does not allege that defendants are not able to pay the full price of the stock, or that, if a judgment is rendered against them for the difference between the price paid and the value of the stock, they will not be able to respond to it.

2. SAME—PAYMENT OF UNAUTHORIZED SALARY TO CORPORATE OFFICERS.

An injunction will not be granted at the suit of a stockholder to restrain the payment of an unauthorized salary, as the person receiving it can be compelled to make restitution.

Action by Abbie S. Nash and others against William P. Hall and others.   Plaintiffs move to continue pendente lite an injunction theretofore granted.   Denied.

John Lindley (Austin Abbott, of counsel), for plaintiffs.

Witter & Kenyon (Charles M. Earle, Robert N Kenyon, and J. S. L'Amoreaux, of counsel), for defendants.

PATTERSON, J.   This is an application to continue, pending suit, an injunction which was issued on the 20th day of November, 1894, and to the restraining clause of which strict attention must be paid in order that the precise questions of fact which are to be considered may not be confused with other matters which are contained in the papers submitted on the motion.   The restraint contained in the order is:

"That the defendants be, and they hereby are, enjoined, until the further order of this court, from giving away or selling for inadequate or illegal consideration any of the goods, property, or capital stock of the said company [the Hall Signal Company], and from wasting any part thereof, and from transferring any of the capital stock of said company now or at any time held by said defendants, or by any one in their behalf, which stock has been issued for an inadequate or illegal consideration; and the said defendants, and each of them, is also enjoined from disposing of or paying out any of the said corporate funds by way of gratuities, gifts, or in any manner than in the ordinary course of transacting the business for which said corporation was organized."

The defendants in the action are:   William P. Hall (who was and is the president of the Hall Signal Company), Frederick P. Mitchell (who seems to have been a special agent for that company), Winfield S. Gilmore, S. Marsh Young, William F. Cochran, Irving Ingraham, Charles E. Parker, John L. Houston, Walsingham A. Miller, W. Seward Webb, Thomas L. James, William J. Arkell, the Hall Signal Company, and other defendants sued by fictitious names.   The plaintiffs in the action are stockholders of the Hall Signal Company, the plaintiff Nash holding 13 shares of the stock, and the plaintiff Ulrich holding 100 shares of the stock; that is to say, the three plaintiffs holding but 113 shares out of 20,000 shares.

A preliminary question arises respecting the right of the plaintiffs to maintain this action under the circumstances set forth in the

complaint, and it is suggested that, in consequence of the small interest which these plaintiffs represent, and the attitude of one Coit, who is the principal affiant for the plaintiffs, to the whole subject-matter of the action, the inference is plain that the suit is not brought in good faith, but for some ulterior purpose best known to Mr. Coit, and that these plaintiffs are merely nominal plaintiffs, who have been induced to bring this suit for some illegitimate object sought to be accomplished by Coit. The comparative smallness of the interest of these plaintiffs as stockholders is not a matter which the court will consider at this time. There is no reason why, if wrong has been done or is likely to be done, the holder of one share should not be as fully protected in his rights as the largest holder; and there is nothing before the court to show, at present, that Coit's attitude to the subject, as the instigator of the suit, is such as to require on that ground alone a dissolution of the injunction now in force. The technical right of the plaintiffs to maintain the action for some relief seems to be established. The affairs of the corporation are now being administered by the very persons who are charged with the perpetration of the acts alleged in the complaint to be unlawful, and, although some of the defendants are directors not implicated in any charge of fraud, yet it is clear that the executive officers of the corporation, who would be the proper persons to institute and carry on suits, could scarcely be expected to take proceedings against themselves; and the authority for such a suit as this is to be found in Kelsey v. Sargent, 40 Hun, 150, and the many cases cited in the opinion of the court in that case, and to which it is now unnecessary to make further reference.

It should be remarked at the beginning, in considering the subjects presented by the papers on this motion, that, with reference to certain of the defendants on the record, there is no charge whatever made of fraudulent or unlawful conduct, or participation in any act mentioned in the complaint, as a ground for the maintenance of the injunction. The defendants Webb, James, Miller, and Houston became connected with the company as directors long after every one of the particular facts complained of was performed, and there is nothing whatever to be imputed to them of wrong in any of the transactions connected with this matter. The attitude in which they stand to the subject is simply that of directors of the corporation and holders of certain shares of the stock said to have been unlawfully and improperly issued by the officers of the company, and the transfer and voting upon which is sought to be restrained; and their principal relation to the subject-matter of the suit seems to be, at most, that of alleged holders of shares, the title to which is impeached in their hands in consequence of the issue being alleged to be fraudulent or ineffectual as against the company, and it being claimed they are not holders of those shares for value or in such a way as would estop the company from claiming the cancellation or retransfer of those shares. But, with regard to the defendants who were the officers of the company or its directors at the times mentioned in the complaint, there are serious questions which will require at the trial very careful attention and examina-

tion. It appears from the allegations of the complaint, which contains the only detailed account of the transactions, that the Hall Signal Company is a corporation created under the laws of the state of Maine, and had at the outset capital stock of $1,000,000, divided into 10,000 shares, of the par value of $100 each, 9,000 shares being common stock, and 1,000 shares being preferred stock; that the company was organized to make, sell, and put up railway signals and signal devices, under the patents of one Hall; that on the 22d of November, 1889, the board of directors of that company passed a resolution which provided that the preferred stock of the company, then in the treasury and unsold, should be held at $100 a share; that on the 6th of January, 1890, there belonged to the Hall Signal Company, and was then in its treasury, 1,000 shares of the preferred stock, and at least 4,745 shares of the common stock; that in June, 1890, the directors of the company increased their number to seven members, and that at a stockholders' meeting in that month the defendant Cochran was elected a director, but it does not appear that the full number of seven directors was made up until the year 1894. It is further alleged in the complaint that on or about January 16, 1891, William P. Hall, being president of the company, sold 270 shares of the company's preferred stock to William F. Cochran for $85 a share, and 214 shares of the common stock at $50 a share, thus making the sale of the preferred stock at $15 less than the fixed price, and the common stock at $25 a share less than the fixed price; and that at a meeting of the directors, held on that day, at which Hall, Cochran, Gilmore, and Ingraham were present, and at which the presence of Hall and Cochran was necessary to make a quorum, a resolution was adopted by the vote of those present to ratify that sale, and it is claimed that Cochran now holds the shares which were sold to him irregularly, as alleged. It is further claimed that at that same meeting, at which the sales were made to Cochran, a resolution was passed that the balance of the company's stock be held at par, and that none be sold at a less price, except on a unanimous vote of the directors; and it is also claimed that that resolution still exists in full force, and has never been rescinded, except in so far as it has been wrongfully modified by some of the defendants acting as directors and for their own private advantage. It is further alleged that at a meeting of the directors held in May, 1891, authority was given to sell 200 shares of the stock at $90 a share, and that at this meeting Cochran, Ingraham, Hollister, Gilmore, and William P. Hall were present, and that the presence of Gilmore and Hall was necessary to make a quorum; and in October, 1891, at a meeting of the directors, five being present, a resolution was passed that the company having lately acquired and secured the control of some improved mechanical signals and appliances pertaining to their business, and it being necessary to have some cash capital to place the same in the market, and in order to raise that capital it was voted that the stockholders of record on October 20, 1891, be given an option to purchase an equal amount of treasury stock to their present holdings at $50 per share, and said option to hold good until November 20, 1891.

It is then alleged that said directors and one Alvah W. Hall held as stockholders nearly all of the stock which had heretofore been issued, and which was then outstanding and not in the treasury of the company, and that hence those were the persons to be benefited by this resolution, that they might get the stock at half its value, there being in connection with the statement an allegation that the stock was salable at the time this last resolution was passed, and was actually sold at or near par. It is further alleged in the complaint that in the months of March, April, and May, 1892, an authorized agent of the Hall Signal Company represented to intending purchasers of the stock that the salary of the president did not exceed $3,600 a year, and that the treasurer was acting as such without any compensation, and that the shares were bought by various persons, including these plaintiffs, upon the faith of such representations; but, notwithstanding that, the then acting directors of the company passed a resolution by which the defendant William P. Hall was authorized to purchase from the company 500 shares of the full paid common stock at $50 a share, and that such sale was authorized ostensibly in order to remunerate Hall for extraordinary services rendered to the company, and that at the meeting at which this was done there were only three directors present, one of whom was Hall, the beneficiary of the resolution, and that Hall, knowing of the limitation of the prices of the stock, and being a director and president of the company, took from the treasury of the company other shares, some of which were sold at $90 a share, thus taking to himself about $18,800, for which he has never accounted to the company, and that at this time the stock was actually selling at $90 a share and upwards. It further appears that on or about June 8, 1892, a stockholders' meeting was held in Maine, and Gilmore, one of the directors, represented at this meeting that an additional capital of $1,000,000 was required, making $2,000,000 in all; that thereupon a resolution was passed authorizing the increase of the capital by the issuing of 10,000 shares of common stock, and that such stock might be issued for the purpose of purchasing property, patents, and rights, as the directors of the corporation might deem for its best interest, and that thereupon Gilmore, Cochran, and William P. Hall, acting as a board of directors, did issue 10,000 shares of the new stock in payment for patents which were then valued at the full sum of $1,000,000; that thereupon a circular was issued, signed by William P. Hall, the president of the company, and the stockholders of the Hall Signal Company, offering additional shares of the new stock of the company, to the amount of 20 per cent. of the holdings of the stockholders of the old stock, at the rate of $50 a share, the proceeds of such purchase to be used for the purchase of a controlling interest of the Johnson Signal Company, and for the further development of the business of the company. This Johnson Signal Company was a New Jersey corporation, organized for the purpose of making railway signals, and the directors of the Hall Signal Company undertook to buy 2,000 shares of the stock of that company for the sum of $100,000, the object of this being undoubtedly to

secure a controlling interest in the stock of a rival company. It is alleged that the amount paid was in excess of the value of the shares of the Johnson Signal Company, and it is also alleged that instead of applying the moneys received from the sale of the 2,000 shares of the Hall Signal Company stock the directors only applied $34,400 to the purchase of the Johnson Signal Company stock, leaving an indebtedness of about $50,000 on that account, to secure the payment of which they left all of the Johnson Signal Company stock for which they had contracted in the hands of a trustee, and also pledged other securities belonging to the Hall Signal Company as further security for the Johnson Signal Company stock, and that a large portion of that still remains unpaid, and that the moneys and property of the Hall Signal Company have been grossly mismanaged and wasted in this transaction. The complaint also sets forth other acts of mismanagement on the part of the directors, William P. Hall, Gilmore, and others, and then proceeds to charge that, in the years of 1892 and 1893, one Adoniram J. Wilson was employed as a superintendent of the Hall Signal Company, and that he made certain inventions and improvements which affected the patented improvements or devices which belonged to the Hall Signal Company, and which were regarded as being the property of that company, and that on August 4, 1892, he assigned his inventions and improvements to the company; that about a year and a half after this assignment of August 4, 1892, and without any further assignment or consideration whatever, the defendants William P. Hall, Parker, and Gilmore, desiring to obtain possession of 3,000 shares of the stock of the company, passed a resolution, at a meeting of the board of directors held in the city of New York, in the following words:

"That as has been agreed between the Hall Signal Company and Adoniram J. Wilson that the latter should assign and transfer to said company his entire interest in all the inventions of railroad signaling devices in and for the United States, and in all United States patents granted therefor, and that said company should pay the said Wilson suitable compensation therefor, to be agreed upon, and as the said Wilson had from time to time so transferred his inventions of the United States applications and patents to the Hall Signal Company, and in pursuance of the said agreement; and as, in the judgment of the board of directors, the United States applications and patents are equal in value to three thousand shares of the common stock of this company, and the said Wilson has agreed to accept that amount of stock in full payment to date for all such inventions, applications, and patents,— W. S. Gilmore, treasurer, be, and he is hereby, authorized and directed to transfer and cause to be transferred to Adoniram J. Wilson three thousand shares of the full-paid common capital stock of the Hall Signal Company out of the balance of ten thousand shares of stock set over and assigned and transferred to this company by William P. Hall and W. S. Gilmore on July 6, 1892, and the said three thousand shares to be accepted by Adoniram J. Wilson in full payment to date for any and all claims of the said Wilson against the Hall Signal Company for said applications and patents."

It is further set forth in the complaint that the only directors present at this time were Hall, Parker, and Gilmore; that they did not constitute a quorum of directors, and that if they had done so the votes of at least two would have been necessary; that they caused the resolution to be entered in the minutes of the board of

directors of the said Hall Signal Company, under date of December 22, 1893, as if it were a valid act of said corporation by its board; that the said Wilson paid no consideration for the last-mentioned 3,000 shares of stock, and never received nor controlled nor disposed of said stock for his own benefit, but that the entire transaction was a device and pretext to enable the said president, William P. Hall, and the said treasurer, Winfield S. Gilmore, to take and dispose of the stock at their own pleasure, which they did. It is further alleged that on the 4th day of May, 1894, Hall, Parker, Miller, and Gilmore, acting as directors, passed a resolution fixing the salary of Hall, as president, at $10,000 a year from the 1st of January, 1894, and that Hall has been receiving payment of a salary at that amount; that Hall voted for the resolution, or was present, and his presence was necessary to make a quorum. The complaint then proceeds to state various acts of mismanagement of the directors and officers of the corporation, and violations of the laws of the state of Maine, obligatory upon corporations of this character; the failure to keep proper books and make proper entries, giving the details or an account of these various alleged unlawful transactions; the falsification of the records; and particularly that on the 22d of December, 1893, Wilson, without receiving any consideration at all, transferred 1,000 of the 3,000 shares to the defendant Webb, and 2,000 of such shares to the defendant Arkell, and that Arkell has transferred 150 shares to other parties, and that those shares are now held without consideration, and that all of the directors except Webb, James, Arkell, and Mitchell have neglected their duty of keeping an account or records; and other allegations of improper conduct. The relief prayed for is that the 270 shares of preferred stock, and 214 shares of the common stock, sold to Cochran, be declared to have been sold without authority, and that the defendants Cochran, Hall, Gilmore, and Ingraham be directed to pay into the treasury of the Hall Signal Company the difference between the price paid and the price fixed as the value of these shares; that the same relief be granted as to the 500 shares of common stock sold to William P. Hall; that a discovery be ordered as against the defendants Hall, Gilmore, Young, Cochran, Ingraham, Parker, and Houston as to 2,000 of the shares of the common stock of the company, and that they be ordered to pay forthwith into the treasury of the company, and account for all profits which any of them may have received or derived from such 2,000 shares, and that they also pay into the treasury such sum or sums as may be found on such accounting to have been lost, wasted, misapplied, or diverted from the purpose for which such sum or sums were contributed, by reason of the said transactions set forth in the complaint; that the transfer of the 3,000 shares of the common stock of the corporation to Wilson be declared to be illegal and void, and the defendants Hall, Parker, and Gilmore, and such other of the directors who have assented thereto, and any of the other defendants herein who have profited thereby, in whole or in part, may be ordered and directed to forthwith transfer and deliver those shares to the Hall Signal Company, or pay into the treasury

of the corporation the value of such shares as may not be transferred to the corporation, and that the defendants who have profited thereby be ordered and directed by this court to forthwith pay into the treasury of the corporation the full value of such shares as they may have taken, and that the court adjudge and decree that the act of the directors in attempting to increase the salary of William P. Hall be declared to be illegal and void, and that the payments made by virtue of the resolution of May 4, 1894, be restored to the treasury of the corporation, and then that an injunction be issued substantially in the words of the temporary injunction now under consideration, and that the defendants Hall, Gilmore, and Parker be enjoined from exercising as an executive committee any of the duties of directors of the corporation or any of the powers of directors, and that the individual defendants be enjoined until the further order of the court from voting upon the stock which has been specifically referred to, and that the servants and agents of the corporation be enjoined from transferring any of the stock thus referred to, and for other relief.

I have gone thus particularly into the averments of the complaint in order that the scope of the inquiry may be limited to those matters which stand on the record as specific accusations of wrongdoing against the various defendants, and for the reason that in actions of this kind general charges are of no consequence whatever, and, when grave imputations are made of the character here presented, the parties against whom they are made should be called upon to respond only to the specific things alleged against them. Taking up the answers that have been interposed, all of the material charges are denied, justified, or sought to be explained. All the alleged equities of the complaint are denied under oath, and it is claimed that all sales of shares were made by due authority of the board of directors. There is a charge made in some of the affidavits of the plaintiff used on this motion, but not referred to in the complaint, respecting a purpose of the directors of the Hall Signal Company to transfer its rights and business to the General Electric Company. This intention imputed to the directors of the Hall Signal Company is specifically denied, and there is no cause whatever for an injunction to issue concerning that accusation, because the directors of this company not only disclaim any such purpose, but they are powerless to make any valid transfer of the character referred to; it would be merely a void transaction on the part of the directors. Whether, under the law of the state of Maine, such a transfer might be made by the stockholders is a question not to be considered now. It must be left to the determination of the courts of that state as to whether or not it is competent for a corporation, with the assent of its stockholders, to make such a disposition of its property. This question does not arise under this complaint, and it is not a question we are now called upon to decide. Taking up the specific allegations referred to in the complaint, as constituting fraudulent or wrongful conduct on the part of the directors of the Hall Signal Company, the first answer that is made by the defendants is that all of their acts and doings

have been ratified by the shareholders. I have carefully examined all of the papers upon this subject of ratification, and I must say that, upon the presentation as made, I am not at all satisfied that there has been any such ratification as would constitute an acceptance or adoption by the stockholders of all of the acts complained of. This alleged ratification seems to have been made pursuant to some permission of a special act of the legislature of the state of Maine, and the stockholders seem to have ratified only such transactions as were spread upon the minutes of the Hall Signal Company. I am not at all satisfied that these transactions in their real character were so fully spread upon the records as to be intelligible to all the stockholders who were present in person or by proxy at the meeting at which the alleged ratification took place. But I do not consider the question of ratification as being, at this time, a radical one, for, as the facts are shown, the merits of the controversy may be disposed of, so far as this motion is concerned, without reference to that. Concerning the maintenance of this temporary injunction, the real question is, is there any occasion for any restraint whatever upon any of the parties at the present time? We will assume that the action is properly brought. We will also assume that certain of these defendants may be responsible for their acts to the corporation, and, under the circumstances of this case, may be required to account in this action, and that they may by final judgment be compelled to pay moneys into this corporation; but it does not follow therefrom that an injunction is necessary to the preservation or protection of any right which these plaintiffs or other stockholders may have. Concerning the 270 shares of preferred stock, and the 214 shares of the common stock, there can be no doubt that William F. Cochran had a perfect right to buy those shares. The only thing that constituted an apparent wrong in the matter was selling them at a lower price than that which was fixed for them by the corporation, if that restriction actually remained as applicable to those shares at the time they were sold, which is doubtful. This would leave the case merely as one in which Mr. Cochran, or those who sold him the shares, would be liable to the corporation for $15 a share on the preferred stock, and $25 a share on the common stock; and there is no allegation whatever of insolvency of Mr. Cochran or the other parties, or that they are not able to pay the full price, or that if a judgment is rendered against him or them in this action for that difference he or they will not be able to respond to it, and precisely the same thing may be said with reference to the 500 shares of common stock issued to Hall at $50 a share instead of par. If the resolution under which they were sold was not valid, then Mr. Hall is indebted for $50 a share of that stock to the corporation, for he knew of the limitation; and there is no allegation whatever that he is insolvent or is not able to pay the additional sum; and a money judgment is asked for in each case, and granting it would necessarily result in confirming their title to the shares. Concerning the 2,000 shares of the Hall Signal Company issued in the matter of the purchase of the Johnson Signal

Company stock, it is not shown who is the holder of those shares, nor where they are, nor in whose possession they are, nor whether they have been sold; and the only relief that can be awarded as to them would be that the parties who are implicated in the disposition of those 2,000 shares shall account for all moneys or profits which have been received upon them, and shall pay the moneys into the treasury of the Hall Signal Company; but there is no necessity for an injunction with reference to those shares, and, indeed, there are no facts stated in respect of which restraint can be put upon the holder of a specific share or number of shares; or, in other words, there is no way of ascertaining as against whom an injunction should issue, or against what shares an injunction would be made operative in case one were to issue. The serious feature of the matter, and the one in respect of which on the argument of this case I was strongly impressed by the plaintiffs' contention, relates to the 3,000 shares of stock issued to Wilson; but an examination of the papers, however, makes it entirely clear that so far, at least, as the present status of those shares is concerned, the charges of fraud which have been urged against the various parties are not made out in such a way as to induce the court to pass upon the question of fact adversely to the holders of those shares. The plaintiffs have undertaken to present to the court proof of the fraudulent issue of these 3,000 shares of stock, but in their effort to present that proof they have produced and presented evidence directly to the contrary. The history of these 3,000 shares must be borne in mind. All or most of this stock originally was issued for patents, for patent rights, or improvements in railway signaling, and almost all of the capital stock of this corporation, both its first and second issue, seems to have been put out for no other consideration than patent rights and improvements. Wilson was an inventor. He owned patents for improvements, if not for original inventions, and they were transferred to and are used by this Hall Signal Company. The claim made by the plaintiffs that all his inventions and improvements and transfers thereof to the company were merely in pursuance of a duty which he owed to the company, and a right which the company had to his inventions, without further compensation than that which consisted in the payment to him of a salary, has been utterly destroyed by the examination of Wilson, which was taken by the plaintiffs, and which they now present as part of their proofs. I cannot assume that this statement of Wilson is deliberate perjury, or that Hall has been guilty of subornation of perjury. They testified, and it is shown clearly, that from the beginning Wilson was entitled to compensation for the transfer of his patents to the Hall Signal Company; that it was left undetermined as to what that compensation should be until finally it was agreed that the 3,000 shares should be issued to him in full payment for his patents, among which he enumerates some that are stated to be the most valuable and useful of all those connected with the whole system of railway signals. If they are the most valuable, and that is not controverted by the plaintiffs, the amount paid for them would

certainly seem not to be unreasonable, in view of the large amount of stock which was issued for other patents not possessing the same value; but, however that may be, it stands upon this record as clearly established that these 3,000 shares did become the property of Wilson, and were given to him in payment of what was due to him for his inventions. Now, when those shares became the property of Wilson, he had an absolute right to dispose of them just as he pleased; and he might sell them or give them away or intrust them to Mr. Hall to be used as he might deem best for the interest of the company, in bringing in men of means and influence whose relation to the company would increase its business and secure its success, the essential thing being that there was an actual honest issue of the stock, in the first place, to Mr. Wilson; and I am not able to say, on these papers, that that was not so, but, on the contrary, I must conclude, at this stage of the case at least, that those shares were issued for a good consideration to Mr. Wilson, and that his transfer of them has vested a good title as against the company to his transferees, Arkell and Webb, it not being charged that either Arkell or Webb was a party to any fraud, and Arkell swearing in his answer that he paid consideration for the shares transferred to him. Mr. Webb has not been served with process nor with the injunction, but I see nothing whatever in the case that would authorize its maintenance as against him. Concerning the payment of unauthorized salary, of course there is no occasion for an injunction. If that salary is really unauthorized, a person receiving it can be compelled to make restitution. There are no other matters involved in this motion which require particular consideration. On the whole case I am, therefore, of the opinion that the motion to continue the temporary injunction should be denied, and that the injunction be vacated, with $10 costs, and upon the ground particularly that, whatever relief the plaintiffs may be entitled to in this action, there is no necessity and no propriety for any restraint of the court upon any of the holders of this stock at the present time, nor for its interference with the management of this foreign corporation or of its directors, the stockholders being amply protected by such remedy as may be open to them to compel a restitution from solvent persons of the moneys on an accounting for the value of shares of stock, if such shares have been irregularly issued, and that value is properly recoverable by the corporation. If there were allegations or evidence of insolvency or inability of any of the parties inculpated to make payment of any moneys which may be adjudged to be payable by reason of the matters complained of, a different result might follow, and to the extent of enjoining the transfer on the books of the company of the shares which, according to the plaintiffs' own showing, are paid for in part, at least, but no such pretense is made.