Ezrasons, Inc. v Rudd (2025 NY Slip Op 03008)

Ezrasons, Inc. v Rudd

2025 NY Slip Op 03008

Decided on May 20, 2025

Court of Appeals

Cannataro, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on May 20, 2025

No. 2

[*1]Ezrasons, Inc., & c., Appellant,
v
Sir Nigel Rudd, et al., Respondents, Barclays PLC, Nominal Defendant.

Francis A. Bottini, Jr. for appellant.
Lara A. Flath, for respondents.
Securities Industry and Financial Markets Association et al., Chamber of Commerce of the United States of America, Charles K. Whitehead, et al., amici curiae.

CANNATARO, J.

:
Few principles are more firmly entrenched in corporate law than the internal affairs doctrine, a choice-of-law rule providing that, with rare exception, the substantive law of the place of incorporation governs disputes relating to the rights and relationships of corporate shareholders and managers (see Eccles v Shamrock Capital Advisors, LLC, 42 NY3d 321, 328 [2024]; CTS Corp. v Dynamics Corp. of America, 481 US 69, 89 [1987]). On this appeal, plaintiff argues that the New York legislature partially overrode this doctrine more than 60 years ago by granting all beneficial owners of shares in foreign corporations standing to litigate derivatively on behalf of their companies in New York, irrespective of conflicting foreign substantive law.
We disagree. The statutory provisions on which plaintiff relies do not clearly manifest legislative intent to displace the long-settled internal affairs doctrine, and thus do not preclude a defense that plaintiff lacks standing under English substantive law to maintain this derivative action. Moreover, plaintiff failed to preserve any argument that the corporate membership requirement, found in English law and relied on by defendants, is a procedural rather than substantive law. Thus, we agree with the Appellate Division that the complaint was properly dismissed.
I.
The corporation at the center of this appeal is Barclays PLC (Barclays), a bank holding company incorporated under the laws of England and Wales and headquartered in London. Plaintiff Ezrasons, Inc. is a New York corporation and a beneficial owner of Barclays shares. In 2021, plaintiff commenced this action on behalf of Barclays against almost four-dozen current and former Barclays directors and officers and a New York-based affiliate, Barclays Capital Inc. (BCI). The complaint alleged that the individual defendants, aided and abetted by BCI, breached fiduciary [*2]duties owed to Barclays under English law, causing significant injuries to the company.
BCI and certain individual defendants moved to dismiss the complaint on several grounds, including that plaintiff lacked standing under English law to maintain this action because plaintiff is not a registered member of Barclays. Defendants submitted with their motion an affirmation from an English law expert explaining that English statutory and common law limit the right to maintain a derivative action on behalf of an English corporation to registered members of the corporation, excluding beneficial owners like plaintiff. To qualify as a member under English law, a party must be a legal owner of shares and have their name recorded on the company's official register of members.
Plaintiff conceded it was not a registered member of Barclays, but nonetheless argued that it was authorized by sections 626 (a) and 1319 (a) (2) of New York's Business Corporation Law (BCL) to represent Barclays against its management in New York, irrespective of English law. Relying on Culligan Soft Water Co. v Clayton Dubilier & Rice LLC (118 AD3d 422 [1st Dept 2014]), plaintiff argued that those statutory provisions displace the internal affairs doctrine and mandate application of New York substantive law to standing questions in shareholder derivative litigation brought in this state.
Supreme Court granted defendants' motion to dismiss the complaint, explaining that under the internal affairs doctrine, foreign law governs the question of whether a plaintiff has the right to sue corporate management on behalf of a foreign corporation. The court rejected plaintiff's argument that the legislature intended to override that choice-of-law rule when it enacted sections 626 (a) and 1319 (a) (2) of the BCL, agreeing with four decades of case law holding that those provisions "simply confer[] jurisdiction upon New York courts over derivative suits on behalf of out-of-state corporations, but do[ ] not require application of New York law in such suits" (see e.g., City of Aventura Police Officers' Retirement Fund v Arison, 70 Misc 3d 234, 244 [Sup Ct, NY County 2020] [internal quotation marks omitted] [collecting authorities]). Plaintiff appealed.
The Appellate Division unanimously affirmed, agreeing with Supreme Court that plaintiff lacks standing to pursue this shareholder derivative action on behalf of Barclays (217 AD3d 406, 406 [1st Dept 2023]). Expressly adopting the reasoning of Arison, the Appellate Division rejected plaintiff's argument that sections 626 (a) and 1319 (a) (2) displace the internal affairs doctrine and preclude application of English standing law (id. at 406). The court further rejected plaintiff's argument that Culligan "silently overruled the longstanding principle regarding the applicability of the internal affairs doctrine in derivative actions" (id. at 407), emphasizing other decisions in which it "consistently invoked" the doctrine and "appl[ied] foreign law on substantive issues, including those affecting a party's right to sue" (id. at 406, citing Lerner v Prince, 119 AD3d 122, 127-128 [1st Dept 2014] and Hart v General Motors Corp., 129 AD2d 179, 183 [1st Dept 1987], lv denied 70 NY2d 608 [1987]).
This Court granted plaintiff's motion for leave to appeal (41 NY3d 903 [2024]).
II.
In Eccles v Shamrock Capital Advisors, LLC, we recently reaffirmed that New York applies the internal affairs doctrine in litigation implicating internal corporate rights and relationships (42 NY3d 321 [2024]). As we explained, the doctrine operates as a choice-of-law rule and mandates that, "with rare exception, the substantive law of the place of incorporation applies to disputes involving the internal affairs of a corporation" (Eccles, 42 NY3d at 328; see Restatement [Second] of Conflict of Laws §§ 302, 304 [1971]). For purposes of this appeal, we assume that the English membership requirement discussed above is substantive. Although plaintiff argues before this Court [*3]that the requirement is procedural, and thus would not apply in New York even under the internal affairs doctrine (see Eccles, 42 NY3d at 335), that argument was not preserved below.
New York jurisprudence is replete with evidence of our longstanding adherence to the internal affairs doctrine. The roots of the doctrine extend back at least to the mid-nineteenth century, when industrialization and the enactment of general incorporation statutes increased the number of firms with interstate operations (Frederick Tung, Before Competition: Origins of the Internal Affairs Doctrine, 32 Iowa J Corp L 33, 56-67 [Fall 2006]). References to the choice-of-law rule appear in decisions of this Court like Marshall v Sherman, in which we stated that a stockholder's "relation to the corporation is governed by the laws of the state of its creation" (148 NY 9, 18, 21 [1895]), and Merrick v Van Santvoord, in which we observed that a corporation's " 'existence, its franchises, powers, capacities, duties and liabilities, are created, fixed, limited and qualified, both in action and time, by the law of the State granting the charter' " (see 34 NY 208, 222 [1866], quoting Blackstone Mfg. Co. v Inhabitants of Blackstone, 13 Gray 488, 489 [Mass 1859]). The same or similar principles are also referenced in Appellate Division decisions of the period (see e.g., Bank of China v Morse, 44 App Div 435, 438 [1st Dept 1899] [English law governed dispute between English corporation and shareholder], affd 168 NY 458 [1901]; Molson's Bank v Boardman, 47 Hun 135, 141-142 [4th Dept 1888] [declaring it "well settled" that a shareholder's liability for the debts of a Quebec-incorporated company "is governed by the laws of the Province of Quebec and not by the laws of this State"]).
To be sure, like many common-law doctrines, the internal affairs doctrine has evolved over time. For many decades, "cases tended to view the doctrine as jurisdictional," meaning courts would generally refuse to entertain litigation implicating the internal affairs of foreign corporations (Broida v Bancroft, 103 AD2d 88, 90 [2d Dept 1984]; Tung, 32 Iowa J Corp L at 45, 47-48, 66-67; see e.g., Langfelder v Universal Labs., 293 NY 200, 204-206 [1944]; Stenfeld v Toxaway Tanning Co., 290 NY 294 [1943]; Cohn v Mishkoff Costello Co., 256 NY 102, 105 [1931] [per curiam]; Sauerbrunn v Hartford Life Ins. Co., 220 NY 363, 372 [1917]; Marshall, 148 NY at 18, 21; Bickart v Kelly-Springfield Tire Co., 243 App Div 72, 76 [1st Dept 1934]; Hallenborg v Greene, 66 App Div 590, 596-598 [1st Dept 1901]; Redmond v Enfield Mfg. Co., 13 Abb Pr (n.s.) 332, 333-334 [Sup Ct 1872]; Howell v Chicago & N.W. Railway Co., 51 Barb 378, 382-384 [Sup Ct 1868]; Cohen v American Window Glass Co., 126 F2d 111, 113-114 [2d Cir 1942]). In Cohn, for example, this Court, then presided over by Chief Judge Cardozo, explained that "[t]he courts of this State will not take jurisdiction, in ordinary cases, to regulate the internal affairs of a corporation which ought to be managed under the laws and by the direction of the courts of the State or country where it is organized" (256 NY at 105). As this language and a host of other decisions make clear, courts' understanding that foreign substantive law governed internal corporate affairs issues was foundational to their decisions declining jurisdiction over such cases: they did so "on the premises that it was inadvisable to interpret the law of another State, that the possibility of conflicting decisions should be avoided, and that the court's judgment might not be enforceable elsewhere" (Broida, 103 AD2d at 90; see, e.g., Langfelder, 293 NY at 204 ["jurisdiction in any case will be declined . . . where a determination of the rights of litigants involves regulation and management of the internal affairs of the corporation dependent upon the laws of the foreign state" (emphasis added)]; id. at 205 [observing that the "rights of plaintiffs as preferred stockholders . . . depends upon the statutory and decisional law of the State of Delaware"]; Lewisohn v Anaconda Copper Min. Co., 26 Misc 613, 622 [Sup Ct, NY County 1899] [expressing doubt over the court's ability to "determine, with certainty, . . . questions of foreign law," stating: "The questions presented relate [*4]to the internal affairs and management of a foreign corporation. They are questions of Montana law, and should be determined by the courts of that state"]).
Over time, courts developed exceptions to the jurisdictional rule articulated in the cases above. As relevant here, shareholder derivative actions brought on behalf of foreign corporations were entertained in at least some instances (see Goldstein v Lightner, 266 App Div 357, 358 [1st Dept 1943], affd without op 292 NY 670 [1944]; Bickart, 243 App Div at 77-78; but see North v Ringling, 187 Misc 621, 624 [Sup Ct, NY County 1946]). Nonetheless, throughout this period courts frequently reconfirmed the deference owed to the substantive law of the place of incorporation on internal affairs matters (see e.g., Cuppy v Ward, 187 App Div 625, 632-633 [1st Dept 1919] [Laughlin, J., concurring] [acknowledging exceptions to jurisdictional application of the doctrine but indicating that relief "depend(ed) on the foreign law"], affd without op 227 NY 603 [1919]). In Russian Reins. Co. v Stoddard, for example, this Court stated that "[i]f the existence of the (foreign) corporation, its capacity to sue, or the authority of its directors to represent it or to bring the action is challenged, we look to the charter and the law of its corporate domicile for the data upon which we may rest our determination of such questions" (240 NY 149, 154 [1925]). In Southworth v Morgan, we explained:
"The liability of the defendant [stockholder to the corporation] is to be determined by the law of the state of New Jersey. That state, through its laws, gave the corporation its existence, powers, liabilities, and the limits within which it was free to act, and a citizen of this state, who became a shareholder in it, entered into contract relations, the extent and obligation of which depend upon those laws, in so far as they do not violate a statute or the settled public policy of this state" (205 NY 293, 295-296 [1912]).
As more succinctly summarized by the Appellate Division in 1914, "[t]he State of New York has for many years recognized that the internal management of a foreign corporation should be left entirely to the State of its origin" (De Raismes v United States Lithograph Co., 161 App Div 781, 785-786 [1st Dept 1914]).
Following the United States Supreme Court's decisions in Williams v Green Bay & Western R. Co. (326 US 549 [1946]) and Koster v (American) Lubermens Mut. Casualty Co. (330 US 518 [1947]), courts stopped treating the doctrine as a determinative basis to decline jurisdiction, but the " 'internal affairs' choice-of-law rule" remained "well established and generally followed throughout this country" (Hausman v Buckley, 299 F2d 696, 702-703 [2d Cir 1962], citing Willis L. M. Reese & Edmund M. Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum L Rev 1118, 1125 [1958]; Broida, 103 AD2d at 90-92; Novich v Rojtman, 5 Misc 2d 1029, 1032 [Sup Ct, NY County 1957] [dismissing derivative action on forum non conveniens grounds because "it is . . . clear that the action concerns itself with the internal management and affairs of" a Wisconsin corporation and "the determination of the issues will necessarily hinge in large measure on the law of Wisconsin"]; see also Upson v Otis, 155 F2d 606, 610 [2d Cir 1946] [concluding that New York "follow(s) the usual conflict of laws rule in referring to Delaware 'law' to determine the fiduciary obligations of directors of a Delaware corporation"]). Among other issues, the doctrine was used to determine the substantive law governing the rights of shareholders to act on behalf of a foreign corporation or to challenge managerial decisions (see e.g., Hausman, 299 F2d at 702-703 [concluding that New York courts applied the internal affairs doctrine [*5]to resolve conflicts with regard to shareholder derivative standing]; Matter of American Fibre Chair Seat Corp., 265 NY 416, 420 [1934] [recognizing that "(t)he stockholders of a corporation may be the real owners of the corporation, but their right to control the corporation is governed by the law of its creation"]; Newman v Baldwin, 13 Misc 2d 897, 897-898 [Sup Ct, NY County 1958] [agreeing that "since the corporation in whose right this (derivative) action is brought is a Delaware corporation, Delaware law governs the question of whether it was necessary to allege demand on the stockholders that the action be brought"]). A similar principle was codified in the Restatement (see Restatement Conflict of Laws § 183, comment b [1934] ["The right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation"]; see also Milvy v Adams, 16 FRD 105, 108 [SD NY 1954] [recognizing that, "(g)enerally, the law of the state of incorporation, via the conflicts rule of the state of the forum, determines whether a plaintiff need be a stockholder of record in order to bring a derivative suit"]).
Although various rationales have been offered for the doctrine, courts today cite predictability and respect for stakeholders' choices as justifications. This Court and the United States Supreme Court have each described the doctrine "as ensuring that 'only one [s]tate should have the authority to regulate a corporation's internal affairs . . . because otherwise a corporation could be faced with conflicting demands' " (Eccles, 42 NY3d at 336, quoting Edgar v MITE Corp., 457 US 624, 645 [1982]). "In other words, the doctrine 'serves the vital need for a single, constant, and equal law to avoid the fragmentation of continuing, interdependent internal relationships" (id. [brackets omitted], quoting McDermott Inc. v Lewis, 531 A2d 206, 216 [Del 1987]; see also Hart, 129 AD2d at 184 [absent the doctrine, "every (s)tate might seek to judge the board of directors' decision under different public policy standards"]). "In addition to providing consistency to legal obligations, the internal affairs doctrine also protects the interests and expectations of shareholders by giving effect to their choice as to what jurisdiction's laws will govern the corporation's affairs" (Eccles, 42 NY3d at 337).
III.
With this historical context in mind, we turn to the question presented by this appeal: Did the legislature, in enacting sections 626 (a) and 1319 (a) (2) of the BCL, intend to displace the internal affairs doctrine as it applies to shareholder derivative standing? We agree with the lower courts that the statutory provisions do not manifest intent to displace the doctrine in this context.
Like any judicially created rule, New York's internal affairs doctrine is susceptible to override by statute (see Restatement [Second] of Conflict of Laws § 6 [1] and Comment a). However, "[w]e have emphasized that 'a clear and specific legislative intent is required to override the common law' and that such a prerogative must be 'unambiguous' " (Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc., 18 NY3d 341, 351 [2011], quoting Hechter v New York Life Ins. Co., 46 NY2d 34, 39 [1978]). In undertaking this inquiry, as always, "the clearest indicator of legislative intent is the statutory text" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). We presume that "a radical change in the common law by statute . . . will be expressed with the clearness which the importance of the subject demands, or so that its meaning is unmistakable" (Seligman v Friedlander, 199 NY 373, 376 [1910]). For that reason, "the intention to change a long-established [common-law] rule or principle is not to be imputed to the legislature in the absence of a clear manifestation" (Matter of Delmar Box Co. [Aetna Ins. Co.], 309 NY 60, 66 [1955]), or "from doubtful statutory provisions" (Jones v City of Albany, 151 NY 223, 228 [1896]).
The reasoning underlying this presumption applies with full force to statutes alleged to displace the internal affairs doctrine. Courts should not conclude that the legislature intended to [*6]supersede such a long-observed choice-of-law rule absent a clear manifestation in the statutory language. Applying that rule, we disagree with plaintiff that sections 626 (a) and 1319 (a) (2) of the BCL implicitly displace the doctrine as it applies to shareholder derivative standing.
We begin our analysis with section 626. Section 626 (a) provides that "[a]n action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor, by a holder of shares or of voting trust certificates of the corporation or of a beneficial interest in such shares or certificates." It is followed by two subsections framed as pleading requirements that use more mandatory language and effectively limit the persons who can maintain such actions. Section 626 (b) provides that, "[i]n any such action, it shall be made to appear that the plaintiff is such a holder at the time of bringing the action and that he was such a holder at the time of the transaction of which he complains, or that his shares or his interest therein devolved upon him by operation of law." Section 626 (c) provides that, "[i]n any such action, the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort." The remainder of the section is not implicated here.
Plaintiff reads section 626 (a) as bestowing derivative standing on each member of the three classes listed, irrespective of whether they hold the requisite authority to represent the company under the laws of its place of incorporation. Plaintiff accordingly contends that it has standing to represent Barclays in New York because it holds a "beneficial interest in [Barclays] shares," even though it is not a registered member of Barclays entitled to sue under English law (see BCL 626 [a]). Defendants counter, consistent with longstanding authority, that section 626 simply establishes minimum predicates for a New York court to entertain an action brought derivatively on behalf of a corporation, without displacing the internal affairs doctrine or precluding application of foreign substantive limitations on a particular plaintiff's standing (see Arison, 70 Misc 3d at 243-245 [collecting additional authorities]).
Defendants have the better argument. By providing that "[a]n action may be brought" by specified classes of persons, the legislature evidently established a baseline New York standing rule. Under the internal affairs doctrine, however, foreign substantive law controls in the event of any conflict between New York law and the law of a company's place of incorporation on matters relating to its internal affairs. Whether a particular stakeholder is authorized to represent the company, much less in litigation against its managers, is a question that plainly implicates corporate rights and internal relationships.
The text of section 626 (a) does not clearly indicate that it was intended to serve as both a New York standing rule and a choice-of-law directive. The fact that it authorizes actions to be brought on behalf of either "a domestic or foreign corporation" may set the stage for a conflict between New York and foreign standing law, but it does not suggest that New York law should prevail in the event of such conflict. Instead, we read that language as simply confirming New York courts' jurisdiction to entertain derivative actions brought on behalf of foreign corporations—an issue that was unsettled in this state until shortly before the BCL was enacted [FN1]. The language is also [*7]consistent with the principle that New York law applies to all persons and entities properly before our courts absent a conflict of law (see Matter of Allstate Ins. Co. [Stolarz—New Jersey Mfrs. Ins. Co.], 81 NY2d 219, 223 [1993]; Southworth, 205 NY at 296; Ehrlich v Hambrecht, 19 AD3d 259, 259 [1st Dept 2005]; Engel v Clapper, 14 AD3d 855, 856 [3d Dept 2005]; SLS Capital, S.A. v CRT Capital Group LLC, 2020 NY Slip Op 30696[U], *13-14 [Sup Ct, NY County 2020]; Shaev v Pandit, 2014 NY Slip Op 30783[U], *5-6 [Sup Ct, NY County 2014]). The statutory text does not imply that the legislature intended to allow persons who would otherwise have no legal authorization to nonetheless bring a derivative suit on behalf of a foreign corporation.
Recognizing this problem, plaintiff argues that section 1319 (a) (2) supplies the missing manifestation of legislative intent to displace the doctrine. But section 1319 is not a choice-of-law provision either. Titled "Applicability of other provisions," section 1319 merely sets forth a list of various BCL articles and sections, including section 626, and provides that each, "to the extent provided therein, shall apply to a foreign corporation doing business in this state, its directors, officers and shareholders" (BCL § 1319 [a] [emphasis added]). Contrary to plaintiff's contention, this language instructs that the referenced provisions have only limited applicability to foreign corporations. First, it states that those provisions apply to foreign corporations only "to the extent provided therein." Second, it clarifies that when those provisions refer to foreign corporations, they mean only foreign corporations doing business in New York. Nowhere in the text of section 1319 is there a directive that section 626 (a) controls in the event of conflict with foreign substantive law.
Had the legislature intended for sections 626 and 1319 to override the internal affairs doctrine as it applies to shareholder derivative standing, the drafters could have said so expressly. By way of example, consider section 1317. Titled "Liabilities of directors and officers of foreign corporations" it requires that, "[e]xcept as otherwise provided in this chapter, the directors and officers of a foreign corporation doing business in this state are subject, to the same extent as directors and officers of a domestic corporation," to certain specified liabilities, which "may be enforced in, and such relief granted by, the courts in this state, in the same manner as in the case of a domestic corporation" (BCL § 1317 [a]-[b] [emphases added]). "[T]o the same extent as . . . a domestic corporation" is a very different phrase than "to the extent provided therein," the phrase used in section 1319 (a). The former language leaves less room for doubt that the legislature intended its regulation to apply notwithstanding conflicting foreign law (see German-American Coffee Co. v Diehl, 216 NY 57, 61 [1915] [analyzing section 1317's statutory predecessor]).
Under the canon of construction described above, courts generally need not turn to legislative history to divine legislative intent to override the common law; ambiguity itself is fatal (see Assured Guar., 18 NY3d at 351). Even if we were to consider that history, however, it does not supply the clear manifestation of legislative intent needed to displace the internal affairs doctrine. Sections 626 [*8](a) and 1319 (a) (2) were both part of the original BCL, enacted in 1961 following a five-year effort by a joint legislative commission to clarify and modernize New York's business laws (see L 1961, ch 855). Of the 142 legal research reports prepared during that process, only one appears to have informed the drafting of section 626. If anything, it suggests that section 626 (a) was intended to function as a "definitional provision" identifying the classes who would be subject to the pleading restrictions set out in subsections (b) and (c),[FN2] not to expand the rights of foreign corporate stakeholders (see Joint Legislative Commission to Study Revision of Corporate Laws, Research Outline Analysis, Provisions Relating to Actions by Shareholders § B [a] [iii]). None of the research reports appear to have served as the basis for section 1319, which was added late in the process. That said, the Joint Legislative Commission's Explanatory Memorandum refers to article 1319 as a provision that merely "enumerates the sections of the other provisions of this chapter which apply to foreign corporations generally and to domiciled foreign corporations" (Bill Jacket, L 1961, ch 855 at 32). That explanation suggests section 1319 was intended to compile in one place the various BCL provisions applicable to such entities, not to expand their applicability.
Plaintiff points to a summary comment on the draft BCL from two bar association committees expressing concern that section 1319 appeared to be "an attempt to regulate the internal affairs of foreign corporations" (see Joint Report of N.Y. State Bar Assoc. and Assoc. of the Bar of the City of N.Y. at 34-35 [Jan. 25, 1961]). However, it appears from other legislative records that these committees were primarily concerned with the references in section 1319 to provisions other than section 626, and, in any event, the committees withdrew their objections to the proposed BCL before it was enacted. Nowhere in the final comments on the draft legislation is there any discussion of the BCL
displacing the internal affairs doctrine and superseding foreign substantive law on who is entitled to sue on behalf of a foreign corporation.
Finally, our conclusion today is buttressed by the fact that in the 64 years since the BCL was enacted, the vast majority of New York courts and practitioners have not treated sections 626 (a) and 1319 (a) (2) as displacing the internal affairs doctrine with respect to shareholder derivative standing (see, e.g., Arison, 70 Misc 3d at 243-245; Stephen Blau MD Money Purchase Pension Plan Trust v Dimon, 2015 NY Slip Op 32909[U], *8-13 [Sup Ct, NY County 2015]; David Shaev Profit Sharing Plan v Bank of Am. Corp., 2014 NY Slip Op 33986[U], *5-8 [Sup Ct, NY County 2014]; Potter v Arrington, 11 Misc 3d 962, 966 [Sup Ct, Monroe County 2006]; Lewis v Dicker, 118 Misc 2d 28, 30 [Sup Ct, Kings County 1982]). It took more than half a century for a New York court to first express an interpretation similar to plaintiff's, in a decision that has not been followed and was firmly disavowed by the Appellate Division in this case (see Culligan, 118 AD3d at 422-423)[FN3]. If [*9]plaintiff were correct that the provisions' "meaning is unmistakable" (see Seligman, 199 NY at 376), such a widespread and extended misconception of the law would be odd, to say the least.
IV.
Before concluding, we must address the dissent. As our dissenting colleague acknowledges, his disagreement stems largely from his view that "the internal affairs doctrine did not exist as a choice of law rule in 1961," and, therefore, "when the legislature enacted sections 626 and 1319, there was no common law choice of law doctrine for it to override" (dissenting op. at 2-3). According to the dissent, our legislature has never shown any reluctance to meddle in the internal affairs of foreign corporations—doing so purportedly was "conventional" in the mid-twentieth century (id. at 37)—and the notion that courts regularly deferred to foreign law on such matters is a reinvention of history. And so, the dissent's reasoning goes, it is unsurprising that that the statutory text is not unmistakably clear, and the legislative history is devoid of any discussion of displacing the doctrine on shareholder derivative standing matters.
We are not persuaded by the dissent's attempt to read clear references to the internal affairs choice-of-law rule out of dozens of cases. As just one representative example, the dissent claims that Marshall (148 NY 9, supra) "suggests that when a conflict existed, we would enforce New York law rather than the law of the jurisdiction of incorporation" (dissenting op. at 6). Not so. This Court stated repeatedly in Marshall that "[t]he defendant's relation to the corporation is governed by the laws of the state of its creation" (148 NY at 18; see also id. at 21 ["The relations of the defendant as a stockholder of the corporation are fixed and governed by the laws of the state in which the corporation is domiciled and under which it was created"]). The question in that case was whether there was "some practical method of applying in this jurisdiction the peculiar local remedy for the enforcement of the statutory liability created by the law of the domicile" (id. at 23). We held that there was not, both because of differences in New York procedural law (id. at 21), and because of the risk of inconsistent adjudication, stating that "[a]ll of these questions should be settled in one proceeding, or in one action, and that at the domicile of the corporation" (id. at 23). In other words, we applied both the choice-of-law and jurisdictional components of the internal affairs doctrine. Nothing in the decision suggests that, decades later, when the conception of the doctrine as a jurisdictional bar faded away and New York courts began accepting jurisdiction over claims arising under foreign substantive law, New York would not continue to apply the choice-of-law principle repeatedly pronounced in Marshall, that the law of the jurisdiction of incorporation governs internal affairs matters. As we explained: "The courts of this state are open to all suitors to enforce rights of action . . . recognized by the common law or founded in natural justice, and when no law of the forum or any principle of public policy interferes" (id. at 25). Here, no one argues that the English membership requirement offends New York public policy and thus should not be afforded comity. The sole question is whether a "law of the forum . . . interferes." We conclude, under settled canons of construction, that no such law exists.
The dissent's analysis of the other cases cited in Part II is similarly off base. Our colleague spills a prodigious amount of ink rewriting case law because he can cite to no decision or scholarly authority agreeing with his view that the internal affairs doctrine was not understood of as a choice-of-law rule until the 1960s or later—a position not advanced by any party or amicus here [FN4]. [*10]Concededly, early cases frequently applied the doctrine as "a discretionary way for New York courts to decline jurisdiction over cases that would be better resolved elsewhere" (dissenting op. at 3). But that does not mean that choice-of-law principles were not integral to the doctrine. What the dissent perplexingly refuses to acknowledge is the reason courts declined jurisdiction: their conviction that disputes implicating a business's internal affairs should be resolved "under the laws" of its place of incorporation, and their desire to avoid misapplication of those laws or other encroachment on foreign authority (see e.g., Cohn, 256 NY at 105; Langfelder, 293 NY at 204-205; Lewisohn, 26 Misc at 622; Broida, 103 AD2d at 90)[FN5]. Although the doctrine's application as a jurisdictional bar ended in the mid-twentieth century, the choice-of-law rule carried forward. That is why, only one year after the BCL was enacted, the Second Circuit referred to the " 'internal affairs' choice-of-law rule" as "well established and generally followed throughout this country," including in New York (see Hausman, 299 F2d at 702 [emphasis added]).
Ultimately, the best the dissent can offer in support of its position is a handful of decisions involving foreign corporations in which courts applied New York law without addressing the doctrine (see e.g., Blaustein v Pan Am. Petroleum & Transp. Co., 293 NY 281 [1944]; O'Connor v Virginia Passenger & Power Co., 184 NY 46 [1906]; Leslie v Lorillard, 110 NY 519 [1888]; Nash v Hall, 11 Misc 468 [Sup Ct, NY County 1895])[FN6]. But it is not apparent from these decisions that any party argued for foreign law to apply, or that applicable foreign law differed in any way from New York law [FN7]. As discussed above, it is normal and appropriate for a New York court to apply familiar New York law in a corporate dispute when no conflict of law has been identified (see Matter of Allstate Ins. Co., 81 NY2d at 223; Southworth, 205 NY at 296). Moreover, as we recently confirmed in Eccles, the internal affairs choice-of-law rule does not preclude application of New York procedural law (42 NY3d at 335). And even with respect to substantive law, there are "rare" instances in which New York law will apply to foreign corporations even in the face of conflicting [*11]foreign substantive law (id. at 328, 339-340). For all of these reasons, the existence of pre-1961 cases in which courts applied New York law to foreign corporations is hardly surprising, and does not undermine the conclusion that the doctrine has consistently embodied choice-of-law principles.
The dissent next emphasizes that New York has been more active in statutorily limiting the internal affairs doctrine than most other states, citing the 1897 statutory predecessor of BCL section 1317 (L 1897, ch 384). That may be true, but it does not demonstrate that the legislature intended to limit the doctrine's application to shareholder derivative standing. We have already acknowledged the legislature has the power to override the internal affairs doctrine—subject to constitutional restrictions—and agree that it has done so with respect to at least some internal affairs issues using unmistakable language (see German-American Coffee Co., 216 NY at 63-64). We simply hold today, consistent with longstanding canons of construction, that we will not infer such intent absent an unambiguous manifestation. Furthermore, insofar as no one argues that the legislature has wholly displaced the doctrine, it should not be assumed that because the legislature clearly intended to regulate foreign corporations in some areas, it probably intended to regulate the derivative standing of their stakeholders.
Nor can we accept the dubious assumption that New York intended to preempt foreign standing rules simply because our state occupies a privileged position "at the heart of the American financial system" (see dissenting op. at 32). To be sure, New York has long been "the preeminent commercial center in the United States, if not the world" (159 MP Corp. v Redbridge Bedford, LLC, 33 NY3d 353, 359-360 [2019]), but one need not look very far for proof that aggressive meddling with the rules by which our financial system has long operated poses risks to that status and to our economy. The United States Supreme Court has observed that the "free market system depends at its core upon the fact that a corporation—except in the rarest of situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation" (CTS Corp., 481 US at 90). Our rules of construction wisely counsel caution when attempting to discern legislative intent in this area.
The remainder of the dissent is set against the "backdrop" of its historical analysis and, as our colleague acknowledges, does not apply the presumption against statutory interpretations that would override the common law (see dissenting op. at 42). As this Court has explained, "the isolated statements of . . . individual legislators—and, more so, non-legislators—contained within the legislative history cannot establish legislative intent" (Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 94 [2019] [internal quotation marks omitted]). Even if these sources were properly considered, they at best suggest that the legislature intended foreign corporations and their managers to be subject to the same " 'liability' " and " 'standards as local corporations . . . in a number of areas' " (see dissenting op. at 40, 44). They do not establish that shareholder derivative standing—a subject distinct from the liability and standards that regulate managers' conduct while doing business in New York—was one of those areas.
The dissent's idiosyncratic historical analysis, and the bold declaration about the internal affairs choice-of-law rule that flows from it, are thus misplaced. It is the statutory text that must be carefully parsed, not pre-1961 case law that no party here has challenged, and which is in any event replete with references to a choice-of-law doctrine that courts, legal practitioners, investors, and corporate managers have for generations taken as a given. The question presented today is not an academic or dialectic exercise. And the dissent's novel and untested view of history is not a sound basis on which to undermine a century of common law, the longstanding judicial interpretation of sections 626 (a) and 1319 (a) (2), or the reasonable expectations of foreign corporations doing [*12]business in New York.
V.
In sum, sections 626 (a) and 1319 (a) (2) do not clearly manifest legislative intent to override the internal affairs doctrine on shareholder derivative standing questions. Even if it were proper to consult the legislative history of the BCL to discern such intent, those documents do not clearly support plaintiff's position. Moreover, the legislature has had ample opportunity since 1961 to correct any misconception of its intent. It has not done so. This Court will not overrule a painstakingly developed body of law and decades worth of settled expectations based on one vague statutory sentence and equivocal legislative history.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

WILSON, Chief Judge (dissenting):

Doc Brown and Marty McFly would be impressed with the majority's ability to transport the present into the past to arrive at today's holding. The language of Business Corporation Law § 626 (a) is unambiguous: New York allows derivative actions on behalf of both foreign and domestic corporations, without distinction. Section 1319 (a) (2) limits that right, as applied to foreign corporations, to shareholders of foreign corporations doing business in New York. Together, Business Corporation Law §§ 626 (a) and 1319 (a) (2) allow New York beneficial holders to bring a derivative action on behalf of a foreign corporation doing business in New York. By enacting those provisions after years of careful study, the legislature expressly overrode any foreign share registration requirement.
The majority's analysis suffers from three key errors. First, the majority mischaracterizes our early jurisprudence. The majority concludes that the legislature did not manifest its intent to override the internal affairs doctrine, but fails to appreciate that the internal affairs doctrine did not exist as a choice of law rule in 1961, when the legislature augmented General Corporation Law § 61 and recast it as Business Corporation Law § 626, and enacted section 1319, an entirely new provision. Second, the majority misreads the text and legislative history of sections 626 and 1319. Those provisions, taken together, clearly apply New York law to the question of which shareholders can bring a derivative action on behalf of a foreign corporation. Third, the majority misrepresents the post-1961 caselaw, erroneously claiming that courts have generally not interpreted sections 626 and 1319 as choice of law provisions. In fact, both the Appellate Division and the United States Court [*13]of Appeals for the Second Circuit have held that the provisions govern choice of law. We have never addressed the question.
I.
The majority holds that sections 626 and 1319 are not choice of law provisions because they "do not manifest intent to displace the [internal affairs] doctrine in this context" (majority op at 10). The problem with that conclusion is simple: when the legislature enacted sections 626 and 1319, there was no common law choice of law doctrine for it to override.
The majority's analysis relies almost entirely on the canon of construction requiring the legislature to clearly and specifically override the common law (majority op at 10-11). That canon is rooted in the presumption that the legislature is "aware of the common law" (Gletzer v Harris, 12 NY3d 468, 476-477 [2009], citing McKinney's Cons Laws of NY, Book 1, Statutes § 301 [a]; see also Transit Commn. v Long Is. R. R. Co., 253 NY 345, 354-355 [1930]). Without that presumption, the logic of the canon falls apart. It would be Kafkaesque to require the legislature to manifest a clear intent to displace something nonexistent. But that is what the majority does here. In 1961, enacting sections 626 and 1319 as choice of law provisions would not have conflicted with any common law choice of law doctrine. There was therefore no reason for the legislature to believe it had to override anything at all.
Without ever admitting it is doing so, the majority transports the modern-day iteration of the internal affairs doctrine into our pre-1961 caselaw. In fact, the majority hardly engages with our pre-1961 jurisprudence, instead basing its statement of the internal affairs doctrine on our decision from last year (majority op at 4-5, citing Eccles v Shamrock Capital Advisors, LLC, 42 NY3d 321, 328 [2024]). Reading the law as it stood when the legislature adopted the Business Corporation Law in 1961 reveals three things. First, the internal affairs doctrine existed not as a choice of law rule but as a discretionary way for New York courts to decline jurisdiction over cases that would be better resolved elsewhere. Second, New York courts regularly applied New York common law to shareholder derivative actions brought on behalf of foreign corporations. Third, our court had affirmed the legislature's power to apply New York corporate law to foreign corporations.
A.
I turn first to the internal affairs doctrine. The majority begins its decision with the sweeping statement that "[f]ew principles are more firmly entrenched in corporate law than the internal affairs doctrine, a choice-of-law rule providing that, with rare exception, the substantive law of the place of incorporation governs disputes relating to the rights and relationships of corporate shareholders and managers" (majority op at 1-2). That may be true now (Eccles, 42 NY3d at 328), but (as the majority half-acknowledges) it was not true in 1961. The post-1961 cases relied on by the majority are not relevant to the law as it stood when the legislature enacted sections 626 and 1319. In 1961, the internal affairs doctrine existed as a discretionary way for courts to decline jurisdiction over cases involving foreign corporations, generally on the basis of forum non conveniens. It did not exist as a choice of law rule. In other words, the time is out of joint, and must be set right.
The majority provides two examples of cases in which we purportedly made "[r]eferences to the choice-of-law rule": Merrick v Van Santvoord, 34 NY 208 (1866) and Marshall v Sherman, 148 NY 9 (1895) (majority op at 5). Neither supports the majority's characterization of the pre-1961 internal affairs doctrine as a choice of law doctrine.
The first of the two cases is Merrick v Van Santvoord, an 1866 case involving a Connecticut [*14]corporation known as the Steam Navigation Company (34 NY 208). Merrick established that a foreign corporation may do business solely in New York without losing its existence as a corporation, but said nothing about which law should apply to the "internal affairs" of such a corporation.
The plaintiff in Merrick hired the Steam Navigation Company to tow his canal boat from New York to Albany; on the way, the boat hit a rock and sank in the Hudson (Merrick v Brainard, 38 Barb 574, 575 [NY Gen Term 1860], mod sub nom. Merrick v Van Santvoord, 34 NY 208 [1866]). The plaintiff brought suit against Abraham Van Santvoord, one of the Connecticut corporation's shareholders (Merrick, 34 NY at 210). Under the Steam Navigation Company's charter, the corporation's shareholders could not be subject to individual liability (id.). Supreme Court, however, allowed the plaintiff to recover against Mr. Van Santvoord on the basis that the Steam Navigation company had "migrated from Connecticut to New York; and that, by such migration, it had lost its corporate charter" (id. at 218). As Supreme Court explained it, "a corporation that thus migrates into our state loses its corporate rights, and becomes, as to all persons dealing with it, a mere partnership" (Merrick, 38 Barb at 585). Mr. Van Santvoord, as a partner instead of a shareholder, could therefore be held liable for the Company's debts (id.).
We held that the Steam Navigation Company's activities in New York did not constitute "an act of corporate migration, even if it was capable of such migration," and rejected Supreme Court's concept of "migration and forfeiture" (Merrick, 34 NY at 218, 220). Our decision rested on "the rules of general comity," which required us to respect the existence of a foreign corporation's charter, even when that corporation conducted business in our state (id. at 210; see id. at 215, 216, 217, 218, 219, 221 [repeatedly explaining the rule as based on "comity"]). It was in this context that we quoted Supreme Judicial Court of Massachusetts Chief Justice Shaw's statement that a corporation's "existence, its franchises, powers, capacities, duties and liabilities, are created, fixed, limited and qualified, both in action and time, by the law of the State granting the charter" (id. at 222, quoting Blackstone Mfg. Co. v Inhabitants of Blackstone, 13 Gray 488, 489 [1859]).
Our decision in Merrick did not purport to prohibit the application of New York law to foreign corporations. In fact, Merrick specifically acknowledged that the legislature could choose to abrogate the rules of comity that required us to respect a foreign corporation's charter (id. at 217). In deciding that Mr. Van Santvoord was not individually liable, we recognized that "[t]he rules of comity are subject to the law making power," but noted that New York law did not impose individual liability on the shareholders of foreign corporations as a condition of doing business (id. at 210, 217).
The second case the majority cites is Marshall v Sherman, an 1895 case involving the Miltonvale State Bank, an insolvent Kansas corporation (148 NY 9, 15 [1895]). Far from supporting the majority's view of the internal affairs doctrine, Marshall suggests that when a conflict existed, we would enforce New York law rather than the law of the jurisdiction of incorporation.
Marshall presented a clear conflict between Kansas and New York law. Edward Marshall, a creditor of Miltonvale, sued an individual Miltonvale stockholder (George R. Sherman) to recover the debt the bank owed him (id. at 16). Mr. Marshall's complaint alleged that the laws of Kansas—not the laws of New York—imposed liability upon individual stockholders for the debts [*15]of a bankrupt corporation and permitted individual creditors to enforce that liability against individual stockholders (id.). Under New York law, in contrast, an individual creditor was forbidden from maintaining an action against an individual stockholder for repayment of the corporation's debts (id. at 21-22). Stockholders could be held liable for corporate debts only through a suit in equity brought by or on behalf of all creditors against all stockholders (id. at 22).
In Marshall, we refused to enforce the Kansas laws under which Mr. Marshall pressed his claim (id. at 29). We explained that it was
"a principle of universal application, recognized in all civilized states, that the statutes of one state have, ex proprio vigore, no force or effect in another," and that "the enforcement in our courts of some positive law or regulation of another state depends upon our own express or tacit consent," which "is given only by virtue of the adoption of the doctrine of comity. . . . It belongs exclusively to each sovereignty to determine for itself whether it can enforce a foreign law without, at the same time, neglecting the duty that it owes to its own citizens or subjects" (id. at 24-25).
In other words, the default rule was that New York courts would not apply foreign law. The doctrine of comity directed us to depart from that rule in some, but not all, cases. In Marshall, we held that we would not do so. Enforcing the Kansas laws under which Mr. Marshall brought his claim would have required us "to ignore our own rules of construction and methods of procedure" to achieve "most unjust and oppressive" ends (id. at 28-29). We held that under the circumstances it was "reasonable and just to decline to administer them at all" (id.).
Far from holding that New York law did not apply, we suggested that New York law was the only law our courts would apply to the liability of the Kansas bank's shareholders—even though a Kansas statute said otherwise and the bank was a Kansas corporation. We wrote that "if, under any circumstances, the action could be maintained in this jurisdiction, it must be in such a form and by such modes of procedure as like liabilities created under our own statutes are enforced against our own citizens" (id. at 21). That is to say, Mr. Marshall could have brought an action on behalf of all the corporation's creditors against all the corporation's shareholders under the laws of New York. But he could not bring an action under a Kansas statute in our courts.
Bank of China v Morse, which the majority cites as referencing "[t]he same or similar principles," is similarly off point (majority op at 5, citing 44 AD 435 [1st Dept 1899]). The majority writes that Bank of China stands for the proposition that "English law governed [a] dispute between [an] English corporation and [a] shareholder" (id.). But the reason the Appellate Division applied English law in Bank of China was not that the corporation was English, but that the case required the court to interpret an English contract (44 AD at 438)[FN1]. Finally, Molson's Bank v Boardman, another Appellate Division decision relied on by the majority, is one in which the court expressly [*16]noted that both parties agreed that the laws of Quebec applied, so no choice of law issue was before the court (Molson's Bank v Boardman, 47 Hun 135, 142 [4th Dept 1888]; cf. Watts v Swiss Bank Corp., 27 NY2d 270, 275 [1970] [avoiding conflict of laws question by holding the parties to their agreement that foreign and domestic law were the same]).
In the first half of the 20th century, we did not treat the internal affairs doctrine as a choice of law doctrine. Instead, it was a discretionary basis on which to decline jurisdiction (see Royal China, Inc. v Regal China Corp., 304 NY 309, 312 [1952]; Sternfeld v Toxaway Tanning Co., 290 NY 294, 297 [1943]; Cohn v Mishkoff-Costlow Co., 256 NY 102, 105 [1931]; Sauerbrunn v Hartford Life Ins. Co., 220 NY 363, 371-372 [1917]; Travis v Knox Terpezone Co., 215 NY 259, 264 [1915]). In Travis v Knox Terpezone Co., for example, we rejected a foreign corporation's motion to dismiss a New York resident's suit (215 NY at 262, 266). There, the plaintiff sought to compel the corporation to recognize his ownership of certain stock certificates (id. at 262). Holding that the action did not "involve[] in any prohibited sense a regulation of the internal management of a foreign corporation" (id. at 265), we explained:
"To trace in advance the precise line of demarcation between the controversies affecting a foreign corporation in which jurisdiction will be assumed and those in which jurisdiction will be declined, would be a difficult and hazardous venture. A litigant is not, however, to be excluded because he is a stockholder, unless considerations of convenience or of efficiency or of justice point to the courts of the domicile of the corporation as the appropriate tribunals" (id. at 264).
Two years later, in Sauerbrunn, we declined jurisdiction over a claim by a member of a Connecticut life insurance corporation against the corporation (220 NY at 369). The member alleged that the insurer had charged him a higher rate than that permitted under the contract (id. at 370). The corporation moved to dismiss on the basis that New York courts had no jurisdiction over the member's claim, which "ha[d] for its purpose the regulation of the internal affairs of a foreign corporation" (id.). We held that "[t]he trend of decisions of the courts is contrary to the assumption of jurisdiction by the courts of the action at bar" (id. at 371-372).
In Sternfeld, we again characterized the internal affairs doctrine as a discretionary basis on which to deny jurisdiction (290 NY at 297). There, we affirmed the dismissal of a claim by a stockholder against a North Carolina corporation (id. at 296-297). The stockholder sought to have the corporation's preferred stock issue be declared "illegal and of no effect" (id. at 296). We explained that because a New York judgment "could not be enforced nor could the plaintiff be granted complete relief" without further proceedings in North Carolina, "jurisdiction by our courts will not be entertained" (id. at 297).
Five years later, we reaffirmed our understanding of the internal affairs doctrine as governing whether a court would, in its discretion, take jurisdiction of an action. In Royal China, we held that New York courts should hear a dispute between an Ohio corporation and a New York resident stockholder (304 NY at 313). The corporation brought suit to compel the stockholder to comply with a board resolution requiring all shareholders to surrender their stock certificates in exchange for new [*17]certificates bearing additional information (id. at 312). The Appellate Division dismissed the case on the basis that it should be determined by the courts of Ohio (id.). We reversed, explaining:
"While a court may on its own motion decline jurisdiction in a proper case upon the ground of forum non conveniens or upon the ground that the determination of the rights of the litigants involves the regulation and management of the internal affairs of a foreign corporation, we do not regard the present as such a case" (id.).
Faced with the preceding decisional law, the majority had no real choice but to acknowledge that our early internal affairs cases viewed the doctrine as jurisdictional, not as a choice of law rule (majority op at 6). In an attempt to skirt those cases, the majority claims that "the reason courts declined jurisdiction" was "their conviction that disputes implicating a business's internal affairs should be resolved 'under the laws' of its place of incorporation, and their desire to avoid misapplication of those laws or other encroachment on foreign authority" (id. at 20). To support that assertion, the majority points to two passages from our decisions in Cohn and Langfelder. In Langfelder, we explained that
"jurisdiction . . . will be declined . . . where a determination of the rights of litigants involves regulation and management of the internal affairs of the corporation dependent upon the laws of the foreign State or where the court in which jurisdiction is sought is unable to enforce a decree if made or where the relief sought may be more appropriately adjudicated in the courts of the State or country to which the corporation owes its existence" (293 NY at 204).
Similarly, in Cohn, we declined to hear a case in which a resident plaintiff sought to require a foreign corporation to redeem shares at par value or declare a dividend, explaining:
"The courts of this State will not take jurisdiction, in ordinary cases, to regulate the internal affairs of a corporation which ought to be managed under the laws and by the direction of the courts of the State or country where it is organized. While it is not always easy to say when jurisdiction will be taken and when declined, and while contracts between a foreign corporation and its members will usually be enforced in the courts of this State, it seems clear that the jurisdiction now invoked must be declined under the principle stated. Considerations of convenience, of efficiency and of justice point to the courts of Indiana as the appropriate tribunals to regulate the internal affairs of the defendant corporation" (Cohn, 256 NY at 105, citing Travis, 215 NY at 264).
As the United States Supreme Court recognized, each of these decisions simply reiterates the traditional forum non conveniens factors. In 1933, the Court cited our decisions in Travis and Cohn for the proposition that "jurisdiction will be declined whenever considerations of convenience, efficiency, and justice point to the courts of the state of the domicile as appropriate tribunals for the determination of the particular case" (Rogers v Guaranty Trust Co. of New York, 288 US 123, 131 [*18][1933]). In 1947, the Court reaffirmed its understanding of our caselaw, citing Travis and Langfelder to hold that the place of incorporation was "one, but only one, factor" that should be considered in determining "where trial will best serve the convenience of the parties and the ends of justice" (Koster v [American] Lumbermens Mut. Cas. Co., 330 US 518, 527, 530 [1947]). Neither Cohn nor Langfelder holds that the law of a foreign jurisdiction necessarily governs the internal affairs of a foreign corporation.
To be clear, the internal affairs doctrine—as it existed when the Business Corporation Law was enacted—did not strip New York courts of jurisdiction over cases involving foreign corporations. Courts instead employed the doctrine to decline to exercise the full extent of their jurisdiction. The majority writes that section 626 of the Business Corporation Law "simply confirm[ed] New York courts' jurisdiction to entertain derivative actions brought on behalf of foreign corporations—an issue that was unsettled in this state until shortly before the BCL was enacted" (majority op at 13). But as the cases I have described establish, it was well settled that New York courts had jurisdiction over cases involving foreign corporations [FN2]. In declining to exercise that jurisdiction, we affirmed its existence. In Langfelder, for example, we wrote that "jurisdiction in any [*19]case will be declined either in the absence of jurisdiction in the strict sense or where a determination of the rights of litigants involves regulation and management of the internal affairs of the corporation" (293 NY at 204 [emphasis added]).
The majority further claims that "throughout this period courts frequently reconfirmed the deference owed to the substantive law of the place of incorporation on internal affairs matters" (majority op at 7). To support that crucial allegation, the majority cites two Court of Appeals decisions: Russian Reins. Co. v Stoddard, 240 NY 149 (1925)—a case in which the incorporating state had ceased to exist, replaced by another government the United States had not then recognized—and Southworth v Morgan, 205 NY 293 (1912)—a case in which we expressly held that the law of the place of incorporation governs only to the extent it does not conflict with the law of New York.
Like the rest of our pre-1961 jurisprudence, Russian Reinsurance's holding declined jurisdiction on the basis of comity. The Russian Reinsurance Company was established in 1899 by the Tzarist government of Russia (Russian Reins. Co., 240 NY at 153). It obtained authorization to do business in New York, appointed a New York banking corporation as its trustee, and deposited securities and money with the trustee (id. at 154). After the Russian Revolution, most of the Company's directors fled the country and began holding meetings in Paris (id. at 159). Meanwhile, in Russia, the Company was "actually prevented from conducting its corporate business in the country of its domicile, its property there [was] sequestrated, its business nationalized, and it [was] driven out, if it is possible that a corporation may be driven out from its domicile, and yet maintain its life" (id.). In 1924, the Paris-based directors sued to compel the New York trustee to return the Company's securities and money to them (id. at 154). The New York trustee resisted on the basis that (1) the Russian Reinsurance Company no longer existed, (2) if the Company existed, it had no capacity to sue, or (3) the plaintiffs no longer represented the Company (id.). At the time, the United States had not yet recognized the Bolshevik government (id. at 157). Resolving the case would thus have required us to pass upon the legitimacy and effect of the acts of an unrecognized new government (id. at 158). As we explained:
"The fall of one governmental establishment and the substitution of another governmental establishment which actually governs; which is able to enforce its claims by military force and is obeyed by the people over whom it rules, must profoundly affect all the acts and duties, all the relations of those who live within the territory over which the new establishment exercises rule. Its rule may be without lawful foundation; but lawful or unlawful, its existence is a fact and that fact cannot be destroyed by juridical concepts. The State Department determines whether it will recognize its existence as lawful, and until the State Department has recognized the new establishment, the court may not pass upon its legitimacy or ascribe to its decrees all the effect which inheres in the laws or orders of a sovereign" (id.).
After noting that the Company was "in fact without existence in Russia which has given it birth [and] may be in law non-existent in the countries which have recognized the Soviet Republic" (id. [*20]at 164), we explained our reason for declining jurisdiction over the case as follows:
"We grant admission to the courts of this State to foreign corporations because of comity. We have not admitted to our comity the Soviet Republic, and the plaintiff denies allegiance to it. The claims based upon comity with a government of the Czar which may exist as a juridical concept but is in fact not functioning and is without representative here is tenuous. It should not prevail where injustice follows to one of our own nationals.
Our inability to protect by our judgment this defendant against a second recovery upon the same cause of action presents a strong consideration against assuming jurisdiction of this action. The corporation is deprived of no substantial right or benefit if our courts refuse to entertain jurisdiction of an action brought by it until the time comes when a government which we recognize rules the country of plaintiff's corporate domicile, or at least until the plaintiff corporation is able to re-establish its existence in that domicile, and the machinery provided by its charter for the management of its affairs is again functioning" (id. at 168 [internal citations omitted]).
Russian Reinsurance noted in passing that there were some basic issues—"the existence of the corporation, its capacity to sue, or the authority of its directors to represent it or to bring the action"—that would usually be governed by the law of a corporation's place of incorporation (id. at 154). But it did not establish or suggest that every issue related to the internal affairs of a foreign corporation would, as a default, be governed by foreign law.
Southworth v Morgan is equally inapposite. There, the trustee of a bankrupt New Jersey corporation sued to recover an assessment from one of the corporation's shareholders (Southworth, 205 NY at 295). When the New Jersey corporation was first organized in 1900, its shares were valued at $100 each (id. at 294). But soon after incorporation, the corporation issued 200 new shares to be sold at only $25 each (id. at 295). The subscription agreements for those new shares provided that "$25 per share fully paid for the stock" (id.). The defendant bought two shares (id.). When the corporation became insolvent, the trustee sought to recover $150 from the defendant—the difference between the value of the corporation's shares when it was incorporated, and the price the defendant paid (id.). We held that the corporation was not entitled to do so, because "[t]he subscription agreements . . . are the source and measure of the duty of the subscribers," and the defendant had paid the full cost under the subscription agreement (id. at 300).
The majority quotes a portion of the Southworth decision in which we wrote:
"The liability of the defendant is to be determined by the law of the state of New Jersey. That state, through its laws, gave the corporation its existence, powers, liabilities and the limits within which it was free to act, and a citizen of this state, who became a shareholder in it, entered into contract relations, the extent and obligation of which [*21]depend upon those laws, in so far as they do not violate a statute or the settled public policy of this state" (id. at 295-296).
The majority reads this passage as an endorsement of the internal affairs doctrine as a choice of law rule. But what we actually said was that when a conflict arose, our law would control. The law of the place of incorporation would apply only if it "[did] not violate a statute or the settled public policy of this state" (id. at 296).
Thus, it is unmistakably clear that our pre-1961 "internal affairs" caselaw established that courts could discretionarily decline or agree to hear cases involving the internal affairs of foreign corporations, generally under the doctrines of comity or forum non conveniens.
B.
Before 1961, when New York courts—including ours in several cases—took jurisdiction over shareholder derivative actions brought on behalf of foreign corporations, they applied New York law. The majority asserts that the internal affairs doctrine "was used to determine the substantive law governing the rights of shareholders to act on behalf of a foreign corporation or to challenge managerial decisions" (majority op at 9). None of the sources the majority cites support its argument. The only Court of Appeals decision the majority cites—Matter of American Fibre Chair Seat Corp., 265 NY 416, 420 (1934)—has nothing to do with foreign corporations [FN3]. The majority insinuates that American Fibre Chair Seat Corp. held that the stockholder's right to control the corporation is governed by the law of the place of incorporation (majority op at 9). The initial problem with the majority's position is that there is no reason to believe that American Fibre Chair Seat Corp. was a foreign corporation—nothing in our opinion or the lower court's opinion suggests it was (see generally id.; Matter of American Fibre Chair Seat Corp., 241 AD 532 [2d Dept 1934]). Moreover, our holding was not that foreign law controlled the right to bring a shareholder action, but rather that the shareholders' right to control the corporation was governed by the corporation's charter. In American Fibre Chair Seat Corp., the corporation's shareholders unanimously agreed to amend the certificate of incorporation to permit cumulative voting (265 NY at 419). When the time to vote came, however, the minority shareholders rejected the results of the election on the basis that the corporation's officers had failed to file the certificates required to "carry out and effectuate the purpose of the [shareholders'] resolution" (id.). As we noted, the Stock Corporation Law provided "that provision for cumulative voting is not against public policy, but such provision can be made only by the certificate of incorporation or amendment thereto filed pursuant to law" (id. at 420). Because the shareholders had amended the certificate of incorporation to permit cumulative voting, [*22]we confirmed the results of the election and held that the minority shareholders' objection was "purely technical" (id. at 421). American Fibre Chair Seat Corp. never referenced the law of any state but New York, and relied on a provision of New York law that explicitly permitted the amendment approved by the shareholders. Indeed, if American Fibre Chair were a foreign corporation, the fact that we applied New York law permitting cumulative voting, instead of the law of some foreign jurisdiction, would undercut the majority's position. In all likelihood, though, the company was a New York corporation, and the case is therefore irrelevant here.
Contrary to the majority's suggestion, New York courts applied New York law to shareholder derivative actions brought on behalf of foreign corporations. To understand our caselaw, we must first understand the development of the shareholder derivative action. A shareholder's right to bring a derivative action, including on behalf of a foreign corporation, developed through the common law. We began to set out the requirements for a shareholder derivative action in 1877, holding that shareholders could challenge a director's or officer's misconduct in their own name only if the corporation refused to bring the claim itself (Greaves v Gouge, 69 NY 154, 157 [1877]). Under those circumstances, we held, a shareholder was required to make the corporation a party defendant and to allege in the complaint "that the corporation, on being applied to, refuses to prosecute" (id.). In 1903, we rejected a suit brought by an individual shareholder on his own behalf against the officers of the New York & Northern Company, holding that "the damages belong to the corporation and not to the individual stockholder" (Niles v New York Cent. & H.R.R. Co., 176 NY 119, 126 [1903]). We wrote that the shareholder's injury was one "for which an action could have been maintained by the corporation, its receiver, if one had been appointed, or by any stockholder, after proper demand, in behalf of the company and for its benefit" (id. at 123).
As the years went on, we continued to develop the parameters of shareholder derivative actions. In Pollitz v Gould, we held that a shareholder could bring a derivative action even if the shareholder had acquired stock after the alleged wrongdoing (202 NY 11, 15 [1911]). We described the shareholder's right to bring a derivative action as "a proper and necessary incident to his stock ownership" (id. at 18). The next year, we clarified the requirements for a shareholder derivative complaint, writing:
"It is necessary, therefore, in an action by the plaintiffs to set forth two things, first, a cause of action in favor of the corporation with the same detail of facts as would be proper in case the corporation itself had brought the action; [second], the facts which entitle the plaintiff to maintain the action in place of the corporation" (Continental Sec. Co. v Belmont, 206 NY 7, 15 [1912]).
As our jurisprudence on shareholder derivative actions developed, shareholders of foreign corporations began bringing suit in New York courts. When they did so, we resolved their claims without considering the law of the corporation's place of incorporation (see O'Connor v Virginia Passenger & Power Co., 184 NY 46, 50-52 [1906]; Leslie v Lorillard, 110 NY 519, 522-523 [1888]).
In Virginia Passenger & Power Co., we applied New York law to a derivative claim by a [*23]shareholder of the Virginia Passenger & Power Company (a Virginia corporation) (184 NY at 49). The case arose out of a series of transactions between the Virginia company, the Atlantic Development Company, and Frank and Helen Gould. First, the Development Company acquired a majority of the Virginia company's stock in exchange for a promise to buy or finance $6,550,000 of the Virginia company's mortgage bonds (O'Connor v Virginia Passenger & Power Co., 46 Misc 530, 532 [Sup Ct 1905]). Next, the Goulds acquired the Development Company and a majority of the Virginia company's stock (id.). The Goulds proceeded to cancel the contract between the Development Company and the Virginia company, relieving the Development Company of its obligation to market the Virginia company's bonds (id.). Instead of returning the stock the Development Company had received under the now-cancelled contract to the Virginia company, the Goulds assigned it to themselves (id.; Virginia Passenger & Power Co., 184 NY at 50).
We evaluated the complaint under the New York rules for shareholder derivative actions (Virginia Passenger & Power Co., 184 NY at 50-52). Citing New York law, we held that the plaintiff had stated "a good cause of action in favor of the power company against both Frank and Helen Gould," but had failed to allege a demand upon the corporation or to allege that a demand would be unavailing (id. at 52, quoting Flynn v. Brooklyn City R. R. Co., 158 NY 493, 508 [1899], and citing Greaves, 69 NY 154). In determining whether the plaintiff's derivative claim could move forward, we never referenced Virginia law.
Virginia Passenger & Power Co. was not the first case to apply New York common law to a shareholder derivative claim on behalf of a foreign corporation. In 1888, we held that the shareholder of a Delaware corporation had not stated a valid derivative claim as a matter of New York law (Leslie, 110 NY 519). That case concerned two contracts between rival steamship companies: the Old Dominion Steamship Company ("Old Dominion") and the Lorillard Steamship Company ("Lorillard"). In the 1870s, Old Dominion was a New York corporation that ran a line of steamships between New York and Virginia (id. at 521). In 1873, Lorillard told the officers of Old Dominion that it intended to begin running steamships along Old Dominion's routes. To "cause [Old Dominion] to believe that a formidable opposition would be established against" them, Lorillard made good on its threat (id.). Lorillard ran steamships on Old Dominion's routes "at great loss" until, in January 1874, the two corporations signed an agreement under which Old Dominion would pay Lorillard to stop running steamships along its routes (id. at 521-522). In 1875, the Old Dominion Steamship Company of Delaware was formed and replaced the now-defunct Old Steamship Company of New York (id. at 522). In 1878, Old Dominion (now a Delaware corporation) and Lorillard entered into a new contract (id.). The plaintiff, an Old Dominion shareholder named John A. Leslie, sued to force the corporation to commence an action to recover payments made under both contracts and to cancel the 1878 contract, which was then in effect (id. at 522-523). He alleged that the contract was ultra vires and against public policy and that it was the product of fraud on the part of Lorillard.
Our decision applied New York common law to reject Mr. Leslie's claims on the merits, while expressly noting that shareholders like Mr. Leslie could properly bring derivative actions to resolve the problems of which he complained. With respect to Mr. Leslie's ultra vires and public policy arguments, we did not question "the right of stockholders to . . . arrest by suit an unauthorized course of dealing" (id. at 535). But we applied our own law to hold that the contracts between [*24]Lorillard and Old Dominion were not ultra vires. In a passage that directly addresses the internal affairs of foreign corporations, we explained that a contract would only be considered ultra vires—or outside the scope of the corporation's charter—if it was prejudicial to the public or the stockholders (id. at 532). Because we concluded that the contracts between Lorillard and Old Dominion were neither, we rejected Mr. Leslie's claim.
With respect to Mr. Leslie's fraud claims, we held that although a shareholder could bring a derivative action against directors for fraud, Mr. Leslie's underlying claim lacked merit. We wrote: "it is not made to appear here that there was any collusion between the officers of the New York company and these defendants, and as to the second contract, which was made between these defendants and the Delaware company, of which plaintiff is a stockholder, there is no allegation whatever of any deception or collusion" (id. at 536). Whether a stockholder adequately alleged fraud on the part of a director or officer would seem to be a question of the internal affairs of a corporation. Despite our explicit recognition that the corporation on whose behalf the action was brought was a Delaware corporation, we never referenced Delaware law anywhere in our opinion.
The majority dismisses O'Connor and Leslie on the basis that "it is not apparent from these decisions that any party argued for foreign law to apply" (majority op at 21). With respect to the right to bring a shareholder derivative claim, the parties in Leslie and O'Connor relied on New York law. But that reliance appears to reflect a reasoned decision, not an inadvertent conclusion. The defendants in both cases contended that foreign law applied to some of the questions before the Court. In Leslie, for example, the defendants argued that Delaware law should apply to the plaintiff's ultra vires claim. Specifically, defendants argued that the claim should fail because "[t]he complaint . . . does not show by any affirmative declarations, any statutory limitation of Delaware, or chartered limitation, or express ruling of the Delaware Courts which would have made the execution of Contract 'B' beyond and without the scope of the powers and purposes with which the Old Dominion Steamship Company of Delaware was formed" (brief for defendants-appellants in Leslie v Lorillard, 110 NY 519 [1888], 55). The defendants cited a Supreme Court decision holding that the powers of a foreign corporation "are to be determined by the law of the States by which the corporation was created; and acts are to be deemed by the Courts of this State as valid which are so by such foreign law" (id. at 56, quoting O'Brien v Chicago, Rock Island & Pacific Railroad Co., 53 Barb 568 [Sup Ct 1868]). Similarly, in O'Connor, the defendants cited a decision of the Virginia Supreme Court holding that a shareholder could not bring a derivative action without first making a demand upon the corporation (brief for defendants-appellants in O'Connor v Virginia Passenger & Power Co., 184 NY 46 [1906], 46). The defendants explained: "This extended reference to the opinion in that case has been made because it is the opinion of the highest court of a sister State and one that is the home of the corporation defendant, the Virginia Company . . . [I]t would seem that should have great weight in the determination of the present case" (id.). Nevertheless, our decisions in both cases relied only on the law of New York.
In 1943, the McKinney's Notes of Decisions stated that resident stockholders of foreign corporations could bring derivative actions in New York under General Corporation Law § 61. The Notes cited Nash v Hall, in which Supreme Court held that plaintiffs had the right to bring a derivative action on behalf of a Maine corporation against the corporation's directors (11 Misc. 468, 470-471 [1895]). In Nash, Supreme Court appears to have applied New York law to the question [*25]of whether the defendant directors breached their fiduciary duties (id. at 478-480).
In 1944, we went further, affirming an Appellate Division decision that the internal affairs doctrine (as it then existed) did not apply to shareholder derivative actions at all (Goldstein v Lightner, 292 NY 670 [1944]). In Goldstein, the Appellate Division reversed the dismissal of a shareholder derivative action alleging that the directors of a foreign corporation "breach[ed] . . . their fiduciary duty resulting in waste of the corporate assets" (Goldstein v Lightner, 266 AD 357, 358 [1st Dept 1943], affd, 292 NY 670 [1944]). The Appellate Division held that the rule that cases involving the internal affairs of foreign corporations should be dismissed for forum non conveniens did not apply (id.). We affirmed without opinion (Goldstein, 292 NY at 670-671).
Until 1944, the statutory provision creating a right of action against officers of a corporation did not mention either shareholders or foreign corporations (see L 1944, ch 667, § 1). Section 60 of the General Corporation Law made directors and officers liable for misconduct. Section 61 provided that an action could be brought for the relief prescribed in section 60 "by the attorney-general on behalf of the people of the state, or . . . by the corporation or a creditor, receiver or trustee in bankruptcy thereof, or by a director or officer of the corporation" (L 1944, ch 667, § 1).
In 1944, the legislature recognized that shareholders of foreign corporations had a right of action in New York against the directors and officers of those corporations by adding the following qualification to General Corporation Law § 61:
"In any action brought by a shareholder in the right of a foreign or domestic corporation it must be made to appear that the plaintiff was a stockholder at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law" (id.).
The purpose of the 1944 amendment to section 61 was not to grant a new right for shareholders to bring derivative actions, but to prevent so-called "strike" suits by limiting which shareholders could bring a derivative action (Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 48, Provisions Relating to Actions by Shareholders, at 2; see generally Bill Jacket, L 1944, ch 667). The reference to shareholders of foreign or domestic corporations thus statutorily adopted the pre-existing common law right of a shareholder in a foreign corporation to bring a derivative action in New York.
A few months after the legislature amended section 61, we applied New York law to a shareholder derivative claim on behalf of Pan American Petroleum and Transport Company (Pan Am), a Delaware corporation (Blaustein v Pan Am. Petroleum & Transp. Co., 293 NY 281, 287, 303-304 [1944]). In Blaustein, Louis and Jacob Blaustein, minority shareholders and directors of Pan Am, brought a derivative action against individual Pan Am directors pursuant to sections 60 and 61 of the General Corporation Law (id. at 287). The Blausteins also brought claims against Standard Oil Company (Indiana), Pan Am's majority shareholder (id.). The case revolved around a 1932 agreement under which Pan Am was to be reorganized into a fully integrated oil company, acquiring property, producing crude oil, refining that oil into gasoline, and marketing the gasoline across the United States (id. at 290). The Blausteins alleged that Indiana and the individual directors had [*26]breached fiduciary duties to Pan Am's minority shareholders by (among other things) outsourcing a portion of Pan Am's refining to an Indiana affiliate (rather than building a refinery with the capacity to meet all Pan Am's requirements), outsourcing its crude oil purchasing to an Indiana subsidiary, and failing to purchase certain crude oil fields that would have allowed Pan Am to meet its market needs (id. at 292-293).[FN4]
We held that neither Indiana nor the individual defendants had breached their fiduciary duties as a matter of New York law (see id. at 300-304). The scope of the fiduciary duty would seem to be squarely within the internal affairs doctrine. But although Pan Am was a Delaware corporation, our decision never referenced Delaware law.
In Hirshhorn v Hirshhorn, decided in 1952, the Appellate Division remitted to the trial court the question of which jurisdiction's law governed a shareholder's ability to bring suit on behalf of a Canadian corporation (280 App Div 791, 792 [1952]). Canadian law restricted the right to bring a derivative action to a registered shareholder, whereas New York law did not. The majority sent the question of which law controlled back to the trial court, explaining that "[u]ntil the question shall be determined, . . . it is not before us for review" (id.). The dissenting Justices would have held that New York law applied, citing General Corporation Law § 61, and pointing to the fact that the Canadian corporation was doing business in New York and the acts complained of were performed in New York (id. [Johnston, J., dissenting]). None of the five members of the Hirshhorn panel believed that a settled common law rule existed requiring the law of the place of incorporation to govern the right to bring a shareholder derivative action. The only two judges who believed there was any clear rule at all would have applied New York law.
In general, when New York courts chose to retain jurisdiction over cases involving foreign corporations, they applied our common law. That approach aligned with legislative efforts to extend statutory regulations to foreign corporations.
C.
So far two things are clear: the internal affairs doctrine did not exist as a choice of law provision in 1961;[FN5] and New York courts routinely applied New York law to shareholder derivative [*27]claims on behalf of foreign corporations. Our history reveals one more important point: long before it enacted the Business Corporation Law, the legislature understood that it had the power to apply New York law to foreign corporations to the exclusion of the law of the place of incorporation. I should note that the majority agrees that the legislature has the power to displace foreign registration requirements (majority op at 10); they dispute only whether it has done so.
The Business Corporation Law was not the first time the legislature had applied New York law to foreign corporations. In 1897, a Joint Committee of the Senate and Assembly proposed amending New York law "to remove the inequalities which now exist between domestic and foreign corporations transacting business in this state" (Report and Proceedings of the Joint Committee of the Senate and Assembly, Appointed to Investigate Trusts, NY Sen Doc No 40, at 36 [1897]). Specifically, the Committee proposed that
"foreign corporations should be compelled to comply with all those provisions of the local law governing domestic corporations which may be practically extended to them. All requirements of the local law especially designed for the protection of creditors and shareholders should be imposed upon foreign corporations operating here. In this way the main incentive for foreign organization of domestic interests will be removed" (id.).
Implementing the Committee's recommendations, the legislature enacted a bill making officers, directors and shareholders of foreign corporations "liable . . . in the same manner and to the same extent as the officers, directors and stockholders of a domestic corporation" for several violations of New York law and providing that "[s]uch liabilities may be enforced in the courts of this state" (L 1897, ch 384). The goal of the 1897 legislation was to prevent New York corporations from reincorporating in New Jersey, then crossing the river to do business in New York with fewer constraints and restrictions.
New Jersey retaliated against the 1897 legislation by forbidding New Jersey courts from enforcing the liabilities created by the New York legislature (N.J. Laws 1897, chapter 50). The New York legislature did not back down. The provision enacted in 1897 became section 70 of the Stock Corporation Law (see German-American Coffee v Diehl, 216 NY 57, 61 [1915]), then section 114 of the Stock Corporation Law (Corporation Laws of New York: Revised to July 1, 1930, § 114 [1930]). It is now section 1317 of the Business Corporation Law.
In German-American Coffee, we affirmed the legislature's power to apply New York's laws [*28]to foreign corporations that do business in New York and held that it had done so in then-section 70 of the Stock Corporation Law (216 NY at 62). At that time, section 70 provided: "The officers, directors, and stockholders of a foreign stock corporation transacting business in this state . . . shall be liable under the provisions of this chapter, in the same manner and to the same extent as the officers, directors and stockholders of a domestic corporation, for the following acts and omissions" (id.). We wrote that in enacting section 70,
"The legislature meant to extend to foreign corporations transacting business in this state the prohibitions in respect of dividends that earlier sections of the same chapter had already laid on domestic corporations. It meant to ordain and establish an offense against our own laws, and not merely to declare that there should be a remedy for an offense against the home laws" (id.).
Our decision in German-American Coffee reveals that before 1961, New York had no compunctions about applying its law to foreign corporations. The state's willingness to do so rested on the idea that if a company was doing business here it was fair for New York to apply its laws to it. As we wrote in German-American Coffee:
"As long as a foreign corporation keeps away from this state, it is not for us to say what it may do or not do. But when it comes into this state, and transacts its business here, it must yield obedience to our laws. For many purposes the fiction of its residence in the state of its origin must then be disregarded" (id. at 63-64).[FN6]
Against that background, it is not possible to construe Business Corporation Law §§ 626 and 1319 as the majority does—as "simply establish[ing] minimum predicates for a New York court to entertain an action brought derivatively on behalf of a corporation, without displacing the internal affairs doctrine or precluding application of foreign substantive limitations on a particular plaintiff's standing" (majority op at 12).
II.
New York's willingness to regulate foreign corporations reflects its position at the heart of the American financial system (see Frederick Tung, Before Competition: Origins of the Internal Affairs Doctrine, 32 Iowa J Corp L 33, 94 [Fall 2006]) and, beginning in the 1920s, the international financial system as well (Youssef Cassis, Capitals of Capital: The Rise and Fall of International Financial Centers at 114 [Jacqueline Collier trans., 2010]). From the second half of the nineteenth century, the economic and commercial might of the United States was concentrated in New York. Given New York's size and strength, leaving New York was not an option for the nation's major businesses. New York could therefore regulate foreign corporations without fearing that they would flee the state.
By the mid nineteenth century, New York's position at the center of the American financial system was already clear. The national banking system, created through the National Banking Acts of 1863 and 1864, "recognized and reinforced New York's dominant role in the banking system by [*29]creating a pyramidal structure in which reserves flowed toward the nation's financial apex"—New York (Richard Franklin Bensel, Yankee Leviathan: The Origins of Central State Authority at 265 [1990]). Under this pyramidal structure, country banks were required to maintain reserves in the amount of 15% of their notes and deposits (id.). Three fifths of those reserves could be deposited in approved city banks in 17 cities, including Albany and New York (id.). Those city banks, in turn, were required to maintain reserves in the amount of 25% of their notes and deposits (id.). Up to fifty percent of their reserves could be placed in New York City banks (id.). Once deposited in New York, reserves were lent out to brokers and investors, feeding the accumulation of capital in the city (id. at 265-266).
The panic of 1893 highlighted the key role Wall Street played in managing the American economy. The panic began when foreign investors, unhappy with the federal government's refusal to abandon silver and commit to gold, began selling American securities (Charles R. Geisst, Wall Street: A History at 110 [1997]). Reserves fell, and soon the economy was in crisis. More than five hundred banks and fifteen thousand businesses failed, and by the end of 1893, a third of the nation's railroads were in bankruptcy proceedings (id. at 111). The federal government repealed the Sherman Silver Act of 1890, which had triggered the crisis. But the Treasury needed gold, and it turned to Wall Street to get it. In August 1894, the Treasury proposed two bond issues, each of which was "heavily subscribed by New York banks, which were asked to pay for their subscriptions in gold" (id.). A year later, with gold reserves still too low, the New York banks stepped in again to facilitate the sale of $65 million worth of bonds to foreign investors (id. at 112). The banking syndicate—led by J.P. Morgan—made a profit of approximately $6 million on the deal (id.).
New York understood its importance. In 1905, the preface to a history of the New York Stock Exchange declared that at the end of the nineteenth century,
"the New York Stock Exchange easily became, at least for the time, a point of supreme and universal attention; an arena where daily operations ran up to millions of shares of what were really the world's best properties for trade adventure and for investment. It is readily comprehended that upon these activities, under our present civilization, a vast portion of modern industry and progress depend" (The New York Stock Exchange: Its History, its Contribution to National Prosperity, and its Relation to American Finance at the Outset of the Twentieth Century vi-vii [Edmund Clarence Stedman ed., 1905]).[FN7]
Wall Street again displayed its power during the panic of 1907, when it bailed out both the [*30]nation's banking system and the New York Stock Exchange. On October 21, after a months-long decline in the stock market, there was a run on the Knickerbocker Trust Company (Geisst, Wall Street at 119). The bank failed, and the New York banks—again led by J.P. Morgan—stepped in to stave off economic collapse (id.). To support the bankers' efforts, President Roosevelt's Treasury secretary deposited $25 million into the New York national banks. "It was the job of the New York banks to apply the funds as they saw fit to prevent further panics and runs by depositors" (id.). The move "was an extraordinary gesture. . . . The Treasury of the largest emerging economy in the world had to transfer funds to private bankers in order to prevent a financial collapse" (id.). But Wall Street's role did not end there. The president of the New York Stock Exchange "pleaded with Morgan to provide $25 million in funds to back the exchange, fearing it would not be able to remain open" (id. at 120). Morgan and a group of New York bankers did so, and received a standing ovation on the floor of the Exchange (id.). In effect, J.P. Morgan "came out of semi-retirement to act, single-handedly, virtually as a central bank" (Cassis, Capitals of Capital at 123).
The creation of the Federal Reserve banks in 1913 did not displace New York's economic power (see Geisst, Wall Street at 136-137; see also Cassis, Capitals of Capital at 123-124). The New York Federal Reserve Bank was "central to the entire system," and New York "reigned supreme among the twelve" banks (Geisst, Wall Street at 136). The Federal Reserve Bank of New York was also closely tied to Wall Street. Several of its presidents continued to work as private bankers in New York, and "as a result . . . banks continued to do business as they had previously without much concern," keeping "the freewheeling spirit of the nineteenth century alive" (id. at 137).
In the 1920s, New York rose "to the top of the international hierarchy of financial centres" (Cassis, Capitals of Capital at 155). J.P. Morgan & Co. was the largest private bank in the United States, and likely the world (id. at 156). And "[p]erhaps the most telling sign" of New York's prominence "was the fact that all the major foreign banks tried to establish a foothold [here] during the twenties" (id. at 157). By the end of the Second World War and through the fifties, New York was "indisputably the world's leading financial centre" (id. at 204).
The federal government did not begin to comprehensively regulate the stock and bond markets until the 1930s (see Vincent Carosso, Washington and Wall Street: The New Deal and Investment Bankers, 1933-1940, 44 Bus History Rev 425, 425 [1970]). Before the federal government stepped in, it was up to the states to regulate business (see generally Gerald D. Nash, Government and Business: A Case Study of State Regulation of Corporate Securities, 1850-1933, 38 Bus History Rev 144 [1964]). In doing so, New York "enjoyed a luxury unavailable to other state legislatures: it did not fear driving foreign corporations out of the jurisdiction" (Tung, 32 Iowa J Corp L at 95). As the center of the country's financial system, New York was uniquely positioned to fill the gap by setting rules that would govern not only New York corporations, but the many foreign corporations that operated in New York. The legislature did so. As the State Comptroller declared in 1899:
"It is time that great corporations having their actual headquarters in this State and a nominal office elsewhere, doing nearly all of their business within our borders, should be brought within the jurisdiction of this State not only as to matters of taxation, but in respect to other and equally important affairs. This can be accomplished by the adoption of corporation laws worthy of the greatest commercial State in the Union" (Annual Report of the Comptroller at xxvii [1898/1899]).
That context is crucial to understanding New York's position as an outlier in its decision to apply New York law to foreign corporations.
III.
By the time the legislature began to undertake a comprehensive revision of New York's business laws, the idea that New York would apply substantive provisions of its own law to dictate the liability and rights of foreign corporations was conventional. The Joint Legislative Committee spent four years carefully determining which provisions of the Business Corporation Law should apply to foreign corporations and which should not. In doing so, the Committee worked to balance respect for comity with the need to protect New York residents from unregulated or under-regulated corporations.
Sections 626 and 1319 of the Business Corporation Law are the product of that extensive study and negotiation. By its plain text, section 626 (a) applies to foreign corporations to the exclusion of foreign law. Section 1319 (a) (2) underscores and narrows section 626's application to foreign corporations, limiting its reach to foreign corporations doing business in New York.
A.
I begin with the genesis of the Business Corporation Law and its treatment of foreign corporations. The Business Corporation Law was the product of four years of extensive study and debate. On March 22, 1956, the legislature created the Joint Legislative Committee to Study Revision of Corporation Laws ("the Committee") (Robert A. Kessler, The New York Business Corporation Law, 36 St John's L Rev 1, 1 n 2 [1961]). The creation of the Committee was "instigated" by the Committee on Corporation Law of the New York State Bar Association (Public Hearing of the Joint Legislative Committee to Study Revision of Corporate Laws, May 13, 1960, at 30). The Committee's task was to replace the General Corporation Law and the Stock Corporation Law with a new Business Corporation Law that would cover "all ordinary business corporations" (Kessler, St John's L Rev at 2).
To develop the Business Corporation Law, the Committee drew on the American Bar Association's Model Business Corporation Act ("the Model Act"), current New York Law, and the law of ten other jurisdictions: California, Delaware, the District of Columbia, Maryland, Massachusetts, North Carolina, Ohio, Pennsylvania, Texas and Virginia (Kessler, St John's L Rev at 3; see also, e.g., Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 11, Admission of Foreign Corporations, at 2). Consultants—led by Chief Consultant Dean Robert S. Stevens—compared these provisions and prepared research reports, which were circulated to Advisory Subcommittees, the Department of State, and the State and New York City Bar Associations (Kessler, St John's L Rev at 3). The Committee then developed proposed statutory provisions, which were the subject of additional comments (id. at 3-4). In 1960, the Committee introduced a Study Bill and held several public hearings across the state (id. at 4). A bill was introduced "for affirmative legislative action" on January 4, 1961 (id. at 4; 1961 Senate Intro 522). It was revised again in response to comments from the State and City Bar Associations and enacted into law on April 24, 1961, but its effective date was deferred to April 1, 1963, to allow for amendments to conform other laws to it (Kessler, St John's L Rev at 4; L 1961, ch 855, § 1401).
The legislative history of the Business Corporation Law shows a push and pull over two questions. First, which foreign corporations should be subject to New York law? And second, which provisions of New York law should extend to foreign corporations?
In answering those questions, the Committee's goal was to balance "the interests of shareholders, management, employees, and the overriding public interest" (Robert S. Stevens, New [*31]York Business Corporation Law of 1961, 47 Cornell L Quarterly 141, 172 [1962]). In 1962, Dean Stevens, the Chief Consultant to the Committee, the drafter of the Model Act and the author of the dominant casebook on Corporate Law, published a lengthy article dissecting the newly enacted Business Corporation Law. Setting out the two points of view considered by the Committee, he wrote:
"It was strongly urged before the Committee that the policy of other states should be respected and that foreign corporations should be subject to and regulated by the law of the jurisdiction of incorporation, not by the law of New York. . . . On the other hand, it seemed obvious that it would be futile to enact into law what is considered a sound policy towards New York corporations if that law could be evaded by going to some other state to incorporate with the purpose of returning to New York to do business here" (id. at 172-173).
As enacted in April 1961, the Business Corporation Law balanced those views by applying some provisions to all foreign corporations (L 1961, ch 855, § 1320), and others to foreign corporations that were connected enough to New York to be deemed "domiciled" in the State (id.; Stevens, Cornell L Quarterly at 173). Professor Robert A. Kessler, a member of the Research Advisory Subcommittee to the Committee, summed up the balancing as follows:
"Clearly, New York could exclude all foreign corporations if it chose, or require their reincorporation under local law as a condition to doing business. . . . Subjecting foreign corporations to the same standards as local corporations to some extent accomplishes the same results. The new statute attempts to do this in a number of areas" (Robert A. Kessler, The New York Business Corporation Law, 36 St John's L Rev 1, 107 & n 418 [1961] [citing Business Corporation Law §§ 1318-1320]).
The Committee's research reports grappled explicitly with the restrictions that should be placed on foreign corporations. One Research Outline Analysis explicitly recommended subjecting foreign corporations and their directors and officers to the same substantive law as domestic corporations (Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 53, Powers of Foreign Corporations, at 16). The report noted that the Model Act made foreign corporations "subject to the same duties, restrictions, penalties and liabilities as a domestic corporation of like character," and that Texas law went "even further," subjecting the officers and directors of foreign corporations to "the same duties, restrictions, penalties and liabilities as are imposed on officers and directors of domestic corporations" "in matters affecting interstate business" (id.). After comparing the Model Act and the Texas law to the laws of other states, which did not impose the same substantive obligations on officers and directors of foreign corporations, the legislature chose to adopt the combined Model Act and Texan approach (id. at 15). The Reviser's [*32]Notes stated that the proposals would "make the sections with reference to rights, privileges, duties, restrictions, penalties and liability of domestic corporations and their officers and directors applicable to foreign corporations and their officers and directors" (id. at 16).
The legislature's application of New York law to foreign corporations was the logical extension of its pre-1961 efforts. Referencing several existing provisions of New York law, including section 114 of the Stock Corporation Law, the report noted that the new provision "would not materially change the existing New York law" (id.).
Other research reports reflect careful determinations as to which provisions of New York law should apply to foreign corporations. The Research Outline Analysis on charitable contributions, for example, noted that no reference to foreign corporations was needed because "[t]he right of a foreign corporation doing business in this State to make donations is obviously governed by the laws of the State of its incorporation and by its certificate of incorporation, particularly in the complete absence of any statute of this State purporting to regulating donations by foreign corporations" (Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 137, Contributions by Corporations, at 24). The Research Outline Analysis on the defense of ultra vires, in contrast, stated:
"It is considered desirable that wherever possible, the law affecting corporations shall be consistent with respect to both domestic corporations and foreign corporations doing business within the State. For this reason it is considered sensible to extend the statute on defense of ultra vires to those foreign corporations doing business within the State" (Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 136, Defense of Ultra Vires, at 15).
In drafting the provisions of the Business Corporation Law applying to foreign corporations, the Committee painstakingly worked to balance the interests of foreign states with the need to protect New York residents. Our common law rules may have taken a different approach since 1961. But in interpreting what sections 626 and 1319 mean, we must respect the balance the legislature struck.
B.
Sections 626 and 1319, in particular, are the result of the Committee's multi-year balancing deliberations. Not every provision of the Business Corporation Law was extended to foreign corporations. But section 626—through its own text and the text of 1319—was.
Business Corporation Law § 626 (a) provides that "[a]n action may be brought in the right of a domestic or foreign corporation" by beneficial shareholders. Against the backdrop of our 1961 caselaw, that language is enough to show the legislature's intent to apply section 626 to foreign corporations to the exclusion of the law of any other jurisdiction.
The legislative history of section 626 supports the conclusion that it is a choice of law provision. Recall that in 1944, the legislature recognized the right of shareholders of foreign corporations to bring derivative actions under New York law (L 1944, ch 667, § 1). Section 626 continued the application of the shareholder derivative rules to actions on behalf of both foreign and domestic corporations. The Research Outline Analysis on shareholder derivative actions reflected the Committee's understanding that shareholder derivative provisions would govern foreign corporations. It explicitly recommended that derivative complaints should be required to allege that [*33]"the action is brought to enforce a secondary right of one or more shareholders of the defendant corporation, domestic or foreign, because the corporation refuses to enforce a right which may be properly asserted by it" (Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 48, Provisions Relating to Actions by Shareholders, at 7-8).
The majority dismisses section 1319, writing that it "merely sets forth a list of various BCL articles and sections, including section 626, and provides that each, 'to the extent provided therein, shall apply to a foreign corporation doing business in this state, its directors, officers and shareholders' " (majority op at 14, citing Business Corporation Law § 1319). The proposition that section 1319 is a mere "list" is not consistent with what legislative bodies ordinarily do, and does not comport with our canon of construction requiring us to give meaning to all words used by the legislature when possible (Kimmel v State, 29 NY3d 386, 393 [2017], citing Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 587 [1998]). But more importantly, the majority's relegation of section 1319 to inoperative "list" status ignores both the text and the history of section 1319. With respect to the text, section 1319 (a) (2) has two effects. First, it underscores the application of section 626 to foreign corporations. Second (as the majority itself notes), it narrows section 626's application from all foreign corporations to those doing business in New York. The legislative history leaves nothing to doubt.
Early versions of the Business Corporation Law, including the 1960 Study Bill, did not include section 1319 (1960 Study Bill of the Joint Legislative Committee to Study Revision of Corporation Laws [1960 Senate Intro 3124]). Instead, the individual provisions that are now gathered in section 1319, including section 626 (then numbered 6.25) made themselves applicable to foreign corporations (id. § 6.25). The first draft of the Business Corporation Law to include section 1319 was the draft introduced on January 4, 1961 (1961 Senate Intro 522, § 13.19). In that draft, section 1319 (then numbered 13.19) provided that eleven provisions of the Business Corporation Law—including section 626—"shall apply to a foreign corporation, its directors, officers and shareholders" (1961 Senate Intro 522, § 13.19).
After the bill was introduced in January, critics protested that section 1319 was an unwarranted intrusion into the internal affairs of foreign corporations. In a Joint Report, the New York State Bar Association and the Association of the Bar of the City of New York described section 1319 as "an attempt to regulate the internal affairs of foreign corporations" and "strongly recommend[ed] that it should be deleted in its entirety" (Joint Report at 34-35, Bill Jacket, L 1961, ch 855). In a January 1961 public hearing, James Fuld, a representative of the New York County Lawyers' Association, objected to sections 13.18 (which subjected foreign corporations doing business in New York to certain notice provisions) and 13.19 as "an unwarranted assertion of authority by New York State over the internal affairs of foreign corporations" (Public Hearing of the Joint Legislative Committee to Study Revision of Corporate Laws, Jan. 31, 1961 at 64). The following exchange ensued:
"ASSEMBLYMAN BROOK: . . . In connection with the liability to foreign corporations and directors of foreign corporations, from what you say I gather that you believe we should give a more favored treatment to foreign corporation qualified to do business here than we do to our own domestic corporations.
MR. FULD: We do not think, sir, that New York should purport to regulate the internal corporate affairs of foreign corporations.
ASSEMBLYMAN BROOK: That is not a direct answer. We would be treating a foreign corporation with greater favor, under your suggestions, than we do our own domestic corporations.
MR. FULD: That would be the result, yes.
SENATOR ALBERT: Why should we?" (id. at 66).
In the same hearing, Secretary of State Caroline Simon told the Committee that although the government wanted foreign corporations "to come into New York State," it also wanted "to make certain that it isn't to the advantage of a corporation to incorporate in some other state and then come into New York State to do business with fewer limitations than a New York corporation would have" (id. at 106).
The majority dismisses the Bar Associations' Joint Report for two reasons. First, because according to the majority, "it appears from other legislative records that these committees were primarily concerned with the references in section 1319 to provisions other than section 626" (majority op at 16). And second, because the Bar Associations withdrew their opposition to the bill before it was enacted (id.). The majority offers no support whatsoever for its assertion that the Bar Associations were "primarily concerned" with "provisions other than section 626" (id.). And the objection is trivial—the Bar Associations wrote that the entirety of section 1319 was an unwarranted regulation of foreign corporations (Joint Report at 34-35, Bill Jacket, L 1961, ch 855). The second point implies that whereas section 1319 may have been a choice of law provision when it was introduced, amendments between introduction and passage rendered it a mere list. But the amendments between January and April 1961 did not alter the fundamental nature of section 1319.
Between the bill's introduction on January 4, 1961, and its passage on April 24, 1961, the legislature amended section 1319 by eliminating two of the referenced provisions and limiting five of them to the directors, officers and shareholders of "domiciled" foreign corporations (L 1961, ch 855, § 1320)[FN8]. The two provisions that were eliminated from section 1319 were sections 907, which governed the merger or consolidation of domestic and foreign corporations, and 1202, which governed the appointment of a receiver (compare L 1961, ch 855, § 1320 with 1961 Senate Intro 522, § 13.19). The provisions that were made to apply only to domiciled foreign corporations and their directors, officers and shareholders, were sections 721 through 725, all of which concern indemnification (id. § 1320). Then-section 1317 established that a corporation was a "domiciled foreign corporation" if (1) at least two thirds of its total shares were owned by New York residents, (2) at least two thirds of its shares with voting rights were owned by New York residents, or (3) at least two thirds of its business or investment income was allocable to New York for tax purposes (L 1961, ch 855, § 1317). Section 626, along with three other provisions listed in section 1319, [*34]remained applicable to directors, officers and shareholders of all foreign corporations (L 1961, ch 855, § 1320).
The omission of section 907 from the enacted version of section 1319 underscores the function of section 1319 as a choice of law provision. As enacted, section 907 allowed for the merger or consolidation of domestic and foreign corporations "if such merger or consolidation is permitted by the laws of the jurisdiction under which each such foreign corporation is incorporated" (L 1961, ch 855, § 907 [a]), and set out "a few provisions applicable only to this special situation" (Joint Legislative Committee to Study Revision of Corporation Laws, Research Outline Analysis 115, Merger or Consolidation of Domestic and Foreign Corporations, at 20)[FN9]. Under section 907, the default rule for mergers between domestic and foreign corporations was that they would be governed by the same rules applicable to mergers of domestic corporations, including with respect to the shareholder authorization requirement (L 1961, ch 855, § 907 [b]). But in two areas—the permissibility of the merger and its effect—the statute specifically provided that the law of the foreign corporation's jurisdiction could limit the application of New York law (id. § 907 [a], [f]). With respect to the effect of a merger, the statute provided: "If the surviving or consolidated corporation is . . . incorporated under the law of any jurisdiction other than this state, the effect of such merger or consolidation shall be the same as in the case of the merger or consolidation of domestic corporations, except in so far as the law of such other jurisdiction provides otherwise" (id. § 907 [f]). The Bar Associations did not comment on section 907 in their opposition to the Business Corporation Law (Bill Jacket, L 1961, ch 855, at 28-29). The only change to section 907 between introduction and enactment was the addition of a provision forbidding the Department of State from filing a merger certificate "unless the consent of the state tax commission to the merger or consolidation is attached thereto" (compare L 1961, ch 855, § 907 [e] with 1961 Senate Intro 522, § 9.07).
If section 1319 were a mere list of provisions applying to foreign corporations, there would be no reason to remove section 907 between the bill's enactment and its passage. Section 907 does, after all, clearly apply to foreign corporations. But if section 1319 is a choice of law provision applying the listed sections to foreign corporations doing business in New York, it would conflict with the choice of law provisions in section 907, which apply to all foreign corporations that merge with New York corporations, regardless of whether those corporations are doing business in the state.
It is possible that the Bar Associations withdrew their opposition to the Business Corporation Law due to the amendments to section 1319, which narrowed the application of several of the listed provisions. It is also possible that amendments to other sections of the Business Corporation Law persuaded the Bar Associations that the legislation was, as a whole, worth supporting. Regardless, the Joint Report provides important insight into how section 1319 was understood by some of those who were most involved in the drafting of the Business Corporation Law.
The concept of the "domiciled" foreign corporation—created in the enacted version of the Business Corporation Law—was a short-lived experiment, terminated before it ever took effect. In 1962—during the period before the Business Corporation Law as enacted in 1961 became effective—the legislature eliminated the category of "domiciled" foreign corporations and [*35]simultaneously amended section 1319 to apply each listed provision to foreign corporations doing business in New York (L 1962, ch 834, § 100). The test to determine whether a corporation is doing business in New York is focused on the corporation's activities in the state. Our pre-1961 caselaw held that to be "doing business" in New York, a corporation had to "be 'here, not occasionally or casually, but with a fair measure of permanence and continuity' " (Sterling Novelty Corp. v Frank & Hirsch Distrib. Co. (Pty.) Ltd., 299 NY 208, 210 [1949], quoting Tauza v Susquehanna Coal Co., 220 NY 259, 267 [1917]). In Business Corporation Law § 1301 (b), the legislature provided several examples of activities that do not constitute doing business in New York, including: "[m]aintaining or defending any action or proceeding, . . . or effecting settlement thereof or the settlement of claims or disputes," holding shareholder or director meetings, "[m]aintaining bank accounts," and "[m]aintaining offices or agencies only for the transfer, exchange and registration of its securities, or appointing and maintaining trustees or depositaries with relation to its securities."
To counterbalance the broader scope of section 1319 and related provisions, the legislature also enacted Business Corporation Law § 1320, which exempts foreign corporations from certain provisions of New York law, including subparagraph (a) (1) of section 1317 and subparagraph (a) (4) of section 1319, [FN10] if (1) the corporation's shares are listed on a national securities exchange or (2) less than half of the corporation's total business income for the prior 3 years was allocable to New York. The creation of section 1320, like the concept of "domiciled" foreign corporations, makes clear that the legislature believed the provisions listed in section 1319 were designed to reach foreign corporations. Otherwise, there would be no reason for section 1320 to carve exceptions out of section 1319.
In support of its argument that section 1319 is insufficiently clear in its displacement of foreign law, the majority contrasts the text of section 1319 with section 1317, which it believes manifests a clear intent to apply New York law to foreign corporations (majority op at 15). I agree with the majority that section 1317 is a choice of law provision (see German-American Coffee, 216 NY at 62). I do not see, however, the material difference the majority conjures. Section 1317 provides that "the directors and officers of a foreign corporation doing business in this state are subject, to the same extent as directors and officers of a domestic corporation, to the provisions of" sections 719 and 720. Section 1319 provides that the listed provisions, "to the extent provided therein, shall apply to a foreign corporation doing business in this state, its directors, officers and shareholders." Section 626 (a) applies by its plain language to domestic and foreign corporations equally.
In sum, the text and history of sections 626 and 1319 make clear that section 626 (a) applies [*36]to shareholder derivative actions brought on behalf of foreign corporations, even when it conflicts with the law of the corporation's place of incorporation.
IV.
The majority writes that "in the 64 years since the BCL was enacted, the vast majority of New York courts and practitioners have not treated sections 626 (a) and 1319 (a) (2) as displacing the internal affairs doctrine with respect to shareholder derivative standing" (majority op at 17). That is an overstatement of the law. In fact, courts that have considered whether sections 626 and 1319 override the internal affairs doctrine have been divided, with the United States Court of Appeals for the Second Circuit and the Appellate Division holding that they do, and some of New York's trial courts holding that they do not.
It is not difficult to understand why few cases since 1961 have addressed whether sections 626 and 1319 are choice of law provisions. Often, derivative actions on behalf of foreign corporations have, consistent with our early internal affairs jurisprudence, been dismissed on forum non conveniens grounds (see Bader & Bader v Ford, 66 AD2d 642 [1st Dept 1979]; Rohlsen v Latin Am. Airways, 65 NYS2d 644 [Sup Ct 1946]; Langfelder v Universal Labs., 293 NY 200 [1944]; Strassburger v Singer Mfg. Co., 263 AD 518 [1st Dept 1942]; Cohn, 256 NY 102). In 1984, the legislature restricted the courts' ability to dismiss for forum non conveniens by enacting CPLR 327 (b), which prevents courts from dismissing "any action on the ground of inconvenient forum, where the action arises out of or relates to a contract, agreement or undertaking" with a choice of forum clause, "and the parties to the contract have agreed that the law of this state shall govern their rights or duties in whole or in part." That provision was intended to encourage parties to choose New York law. As the bill's sponsors explained, "To the extent that there is uncertainty about any aspect of the ability of a contracting party effectively to submit itself to the jurisdiction of the New York courts, such uncertainty will almost certainly operate to deter the parties from selecting New York law in the first place" (Sponsor's Mem, Bill Jacket, L 1984, ch 421, at 8). Following the adoption of CPLR 327 (b), one would expect that parties that expressly chose New York law and a New York forum in their contracts would not assert that New York law did not apply, and would lose if they tried.
In addition to explaining the dearth of caselaw interpreting sections 626 and 1319, the legislature's endorsement of contractual choice of forum and choice of law provisions highlights the exaggerated nature of the majority's portrayal of the early internal affairs doctrine. The doctrine cannot be so deeply rooted in our state's public policy if, in 1984, New York's legislature authorized private parties to simply contract it away without regard to the public policy interests of foreign jurisdictions (General Obligations Law § 5-1401).
In its only decision addressing the question, the Second Circuit held that sections 626 and 1319 are choice of law provisions (Norlin Corp. v Rooney, Pace Inc., 744 F2d 255, 261 [2d Cir 1984]). In Norlin Corp., a shareholder of a Panamanian corporation sued to invalidate several stock transfers made from the corporation, arguing that the corporation's directors breached their fiduciary duties in making the transfers and that the transfers violated Panama and New York law (id. at 260). The corporation argued that the plaintiff had no right to bring a derivative claim because under the internal affairs doctrine, "a New York court . . . would apply Panama law to determine whether Norlin's shareholders have a cause of action against its directors for breach of their fiduciary duty," [*37]and the plaintiff had failed to comply with a Panamanian law "condition[ing] the existence of a cause of action by shareholders against directors upon the passage of a resolution authorizing the lawsuit at a general meeting of shareholders" (id. at 261). The Second Circuit rejected that argument on the basis that sections 626 and 1319 displace the internal affairs doctrine, writing:
"We need not discuss the fidelity of New York courts to the internal affairs rule at this juncture . . . . We find it unnecessary to adopt the choice of law ruling Norlin urges, because the New York legislature has expressly decided to apply certain provisions of the state's business law to any corporation doing business in the state, regardless of its domicile. Thus, under New York Business Corporation Law ("NYBCL") § 1319, a foreign corporation operating within New York is subject, inter alia, to the provisions of the state's own substantive law that control shareholder actions to vindicate the rights of the corporation. NYBCL § 626, made applicable to foreign corporations by § 1319, permits a shareholder to bring an action to redress harm to the corporation, including injury wrought by the directors themselves" (id.).
The Appellate Division, like the Second Circuit, has held that sections 626 and 1319 are choice of law provisions (Culligan Soft Water Co. v Clayton Dubilier & Rice LLC, 118 AD3d 422, 423 [1st Dept 2014]). The majority claims that Culligan was "firmly disavowed by the Appellate Division in this case" (majority op at 17). But the Appellate Division did not, in fact, disavow Culligan in its decision in the case before us. Instead, the Appellate Division contorted its writing into knots in an attempt not to disavow Culligan, writing that "Culligan addressed only the rare situation in which a foreign entity nevertheless had "such 'presence' . . . in our State as would, irrespective of other considerations, call for the application of New York law" (Ezrasons, Inc. v Rudd, 217 AD3d 406, 407 [1st Dept 2023], quoting Greenspun v Lindley, 36 NY3d 473, 477 [1975]). That reading of Culligan has no basis in the decision itself, which clearly stated: "Business Corporation Law § 1319 (a) (1) expressly provides that Business Corporation Law § 626 . . . shall apply to a foreign corporation doing business in New York. Thus, the issue of plaintiffs' standing to bring a shareholder derivative action is governed by New York law" (Culligan, 118 AD3d at 423). The Appellate Division's "such presence" formulation disregards the four years of study and the subsequent implementation and further amendment of the Business Corporation Law, which was specifically done to redefine the amount of presence needed for certain of New York's laws to attach—and which adopted a standard radically different from and far broader than the Appellate Division's
"rare situation" arising from extraordinarily extensive presence in New York.
Like the Appellate Division and the Second Circuit, scholars have explained that section 1319 "expressly mandate[s] the application of local law to specified internal affairs questions in certain foreign corporations" (Deborah A. DeMott, Perspectives on Choice of Law for Corporate Internal Affairs, 48 Law & Contemp. Probs. 161, 164 & n 22-24 [1985]).
On the other side of the scales, New York trial courts have followed a 1982 Supreme Court decision holding that "section 1319 of the Business Corporation Law is not a conflict of laws rule, and does not compel the application of New York domestic law" (Lewis v Dicker, 118 Misc 2d 28, [*38]32 [1982]; City of Aventura Police Officers' Retirement Fund v Arison, 70 Misc 3d 234, 244 [Sup Ct 2020]; Berger v Scharf, 11 Misc 3d 1072(A) [Sup Ct 2006]; Potter v Arrington, 11 Misc 3d 962, 966 [Sup Ct 2006]). Lewis contains no explanation for disregarding the statutory language of sections 626 and 1319, no examination of the legislative history of those provisions, and scant and conclusory discussions of a few cases it misunderstands. The other lower court decisions merely follow it.
The majority suggests that if the legislature intended sections 626 and 1319 to be choice of law provisions, it "has had ample opportunity since 1961 to correct any misconception of its intent" (majority op at 24). But even putting aside the analytical weakness of any argument resting on legislative inaction (Bourquin v Cuomo, 85 NY2d 781, 787-88 [1995] ["Legislative inaction, because of its inherent ambiguity, 'affords the most dubious foundation for drawing positive inferences' " (Clark v Cuomo, 66 NY2d 185, 190-191 [1985])], the foregoing analysis makes clear that there was no misconception for the legislature to correct. Legislators reading Norlin Corp. and Culligan would have felt confident that sections 626 and 1319 were being interpreted precisely the way they were intended to be. Even more to the point, the majority is asking the legislature to perpetually revise its statutes whenever some of our trial courts improperly interpret them. That rule renders appellate courts superfluous.
V.
In sum, the majority's view boils down to this: today, the internal affairs doctrine is important, and we should not disturb it. That is not an answer to the question before us. We are asked to interpret what our legislature did when it enacted Business Corporation Law §§ 626 and 1319, against the backdrop of a long period when New York's financial dominance was unparalleled. The text of those provisions applies to domestic and foreign corporations alike. In the context in which they were enacted, it is clear that they were intended to function as choice of law provisions, subjecting foreign corporations to the same standards as domestic ones. Through the jurisprudential time machine it has concocted, transporting today's doctrine back to the first half of the last century, the majority's decision forces the legislature to anticipate the evolution of the common law and preemptively disavow it. That is an impossible task; even we do not know what future decisions may hold. I would respect the balance the legislature struck, and recognize that sections 626 (a) and 1319 (a) (2) of the Business Corporation Law permit beneficial shareholders of foreign corporations to bring derivative actions, even if the law of the place of incorporation would not. If the legislature wishes to retreat from what it previously legislated, it needs no time machine.
Order affirmed, with costs. Opinion by Judge Cannataro. Judges Rivera, Singas, Troutman, Halligan and Landicino concur. Chief Judge Wilson dissents in an opinion. Judge Garcia took no part.
Decided May 20, 2025

Footnotes

Footnote 1: The word "brought" also supports the view that section 626 (a) is more concerned with jurisdiction than with substantive issues. In New York, there are few restrictions on who may bring—that is, file—a lawsuit. The merits of a lawsuit, and the plaintiff's right to maintain it, are not determined until later, by motion or at trial (see e.g., CPLR 3211 [a] [3] [authorizing a motion to dismiss on the ground that "the party asserting the cause of action has not legal capacity to sue"]). The word "brought" implies little, if anything, about what choice of law should apply to substantive questions that arise after an action has been filed. It does not dictate that the claims will be maintainable in the face of a defense that the plaintiff—despite being a member of a class listed in section 626 (a)—has no right under applicable substantive law to assert those claims.

Footnote 2: Section 626 (b) through (e) repeatedly refer back to subsection (a) using phrases like "any such action" and "such a holder."

Footnote 3: Plaintiff also relies on Norlin Corp. v Rooney, Pace Inc. (744 F2d 255, 261 [2d Cir 1984]), a decision cited in Culligan. Norlin is not binding on New York courts, and we respectfully disagree with its conclusions on this question.

Footnote 4: The dissent responds to this point by referencing articles by Dean Robert S. Stevens and Professor Robert A. Kessler, but neither discusses the history of the common-law internal affairs doctrine or its applicability as a choice-of-law rule (see also infra at 23).

Footnote 5: The dissent dismissively suggests that this reasoning was "one, but only one, factor" motivating the courts' decisions to decline jurisdiction (see dissenting op. at 12 [internal quotation marks omitted]). But that effectively concedes the point: if the choice-of-law rule did not exist, it obviously cannot have served as a factor at all.

Footnote 6: The dissent also relies on Hirshhorn v Hirshhorn, but in that case the Appellate Division held that choice-of-law analysis was required to determine whether Canadian or New York law governed a shareholder's right to sue derivatively on behalf of a Canadian corporation (280 App Div 791, 792 [2d Dept 1952]).

Footnote 7: The dissent does not explain how, if these cases stood for what it contends—including that New York law governed the fiduciary obligations of foreign corporate directors (see dissenting op. at 27)—the modern internal affairs choice-of-law rule could have developed in the face of that precedent. The decisions have never been overruled or questioned in any relevant respect. We think that is because they do not actually support the dissent's novel view.

Footnote 1: The Appellate Division interpreted the contract and held that "the call upon which the demand against the defendant was based was invalid; that it was beyond the power of the company and liquidator to make, and that the call based upon it was not binding upon the defendant" (id. at 448).

Footnote 2: See, e.g., Hiller v Burlington & Mo. Riv. R. R. Co. in Neb. (70 NY 223, 228 [1877] ["It can make no difference that this is the case of a foreign corporation. The statutes give the Supreme Court jurisdiction of suits against such corporations"]); Palmer v Phoenix Mut. Life Ins. Co. (84 NY 63, 676 [1881] ["The Code of Procedure, which was in force when this action was commenced, provided, in section 427, that an action might be brought against a foreign corporation by 'a resident of this State for any cause of action' "]); Grant v Cananea Consol. Copper Co. (189 NY 241, 247 [1907] ["The great business and commercial transactions of our citizens are now largely conducted through corporations, and no reason is apparent why foreign corporations should be treated differently from foreign individuals. If our citizens have claims against such corporations or individuals, who can be found here within our jurisdiction, they should be permitted to apply to the courts for relief rather than be compelled to follow their debtors into foreign jurisdiction"]); Tauza v Susquehanna Coal Co. (220 NY 259, 267-268 [1917] [Cardozo, J.] [if a foreign corporation "in fact . . . is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts . . . . [T]here is no precise test of the nature or extent of the business that must be done. All that is requisite is that enough be done to enable us to say that the corporation is here. . . . We hold further that the jurisdiction does not fail because the cause of action sued upon has no relation in its origin to the business here transacted"]); Matter of Baltimore Mail S. S. Co. v Fawcett (269 NY 379, 385 [1936] ["The general jurisdiction of the courts of this State extends to transitory causes of action arising in another jurisdiction, even though the plaintiff may not have been a resident of this State when the cause of action arose, and the defendant may be a foreign corporation"]).

Footnote 3: The majority also cites Hausman v Buckley, a United States Court of Appeals for the Second Circuit decision that predates the effective date of the Business Corporation Law (see 299 F2d 696 [2d Cir 1962]), and a provision of the Restatement (First) of Conflicts of Law. The Restatement was published in 1934—long before New York adopted the Business Corporation Law—and for the reasons described herein, it does not tell us what the law was in New York, particularly because New York was a proud and noted outlier in the regulation of foreign corporations, both long before and as reflected in the Business Corporation Law's adoption.

Footnote 4: The majority suggests that the fact that our modern doctrine has not overruled or disavowed our early cases suggests that those early cases did, in fact, articulate a choice of law rule (majority op at 21 n 6). But the majority itself admits that the internal affairs doctrine has "evolved over time" and was initially jurisdictional (id. at 6). The question, for our purposes, is how the legislature understood the doctrine when it enacted the Business Corporation Law. We must therefore ask when the doctrine evolved from a primarily jurisdictional one into a choice of law rule. As I demonstrate here, that evolution occurred after the passage of the Business Corporation Law, rendering the modern conception of the doctrine relied on by the majority irrelevant in determining the legislature's intent in 1961.

Footnote 5: The majority accuses me of "spill[ing] a prodigious amount of ink rewriting case law because he can cite to no decision or scholarly authority agreeing with his view that the internal affairs doctrine was not understood of as a choice-of-law rule until the 1960s or later" (majority op at 19). I will leave it to the reader to determine whether my careful descriptions of this Court's pre-1961 cases are a "rewriting" or rather accurate, detailed summaries showing that the internal affairs doctrine was not a choice-of-law rule but a discretionary consideration akin to forum non conveniens. And as to scholarly articles, I have offered better: not the usual post-hoc scholars interpreting the legislature's work, but the extensive writings of Dean Stephens of Cornell Law School and Professor Kessler of Fordham University School of Law, who were heavily involved for many years in the study and creation of the Business Corporation Law and who memorialized the work of the study group and legislature (see infra at 40-41).

Footnote 6: The corporation recovered against the out-of-state directors (German-American Coffee Co. v O'Neil, 102 Misc 165 [Sup Ct, NY County 1918]).

Footnote 7: By 1938, two New York exchanges—the New York Stock Exchange and the New York Curb Exchange—made up 85 to 90 percent of all trading on organized exchanges (Benjamin Ginzburg, Wall Street Under the New Deal, 245 North Am Rev 58, 61 [Spring 1938]).

Footnote 8: The section numbers changed over this period. Section 1319 was section 13.19 when it was introduced, 1320 when it was enacted, and 1319 after the 1962 amendments. For ease of comprehension, I refer to the modern-day section 1319 as section 1319 throughout.

Footnote 9: The section incorporated the provisions of sections 85 and 91 of the Stock Corporation Law (Stevens, Cornell L Quarterly at 168).

Footnote 10: Subparagraph (a) (4) makes a corporation's shareholders liable for unpaid wages of the corporation's employees. During the Joint Legislative Committee's January 1961 hearing, a representative of the AFL-CIO urged the Committee to "mak[e] foreign corporations which operate in New York State specifically subject to the provisions of the proposed new Corporation Law" regarding unpaid wages. The representative explained: "we believe that there is no reason why shareholders of foreign corporations which employ New York workers should not be subject to the same provisions as the shareholders of a New York corporation" (Public Hearing of the Joint Legislative Committee to Study Revision of Corporate Laws, Jan. 31, 1961, at 176).